[No. S012525. Nov. 15, 1990.]

AIU INSURANCE COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
FMC CORPORATION, Real Party in Interest.

808

810

**COUNSEL**

Buchalter, Nemer, Fields & Younger, Robert A. Zeavin, Deborah A. Pitts, Victor C. Rabinowitz, Randolph P. Sinnott, Morrison & Foerster, Marc P. Fairman, Michael M. Carlson, Annette P. Carnegie and Elizabeth J. Kuczynski for Petitioners.

Thomas W. Brunner as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Hill, Wynne, Troop & Meisinger, David W. Steuber Kirk A. Pasich, Desiree T. Icaza, Tyrone R. Childress, Anderson, Kill, Olick & Oshinsky, Eugene R. Anderson, John H. Gross, Finley T. Harckham, Barbara A. Curran and Bowen H. Tucker for Real Party in Interest.

Freilich, Stone, Leitner & Carlisle, Benjamin Kaufman, Heller, Ehrman, White & McAuliffe, Barry S. Levin, Robert T. Haslam, Celia M. Jackson, Covington & Burling, Robert N. Saylor, William F. Greaney, Folger & Levin, Michael A. Kahn, Gregory D. Call, Lasky, Haas, Cohler & Munter, Moses Lasky, John E. Munter, Scott P. DeVries, William L. Berry, Jr., John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger and Timothy R. Patterson, Deputy Attorneys General, as Amici Curiae on behalf of Real Party in Interest.

**OPINION**

**LUCAS, C. J.**—We are called on to decide whether, under comprehensive general liability (CGL) insurance policies issued by petitioners (insurers) to real party in interest FMC Corporation (FMC), insurers are obligated to

provide coverage to FMC for cleanup and other "response" costs incurred pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 et seq.) and related state and federal environmental laws. FMC seeks review of the peremptory writ of mandate issued by the Court of Appeal, which directed the superior court to enter summary adjudication on this issue in favor of the insurers.

We reverse the decision of the Court of Appeal. The insurance policies at issue provide coverage to FMC for all sums FMC becomes legally obligated to pay as "damages" (under two policy forms) or "ultimate net loss" (under a third) because of property damage. Under established principles of contract interpretation, we construe policy language according to the mutual intentions of the parties and its "plain and ordinary" meaning, resolving ambiguities in favor of coverage. Applying these rules, we conclude that the policies cover the costs of reimbursing government agencies and complying with injunctions ordering cleanup under CERCLA and similar statutes. Although many of the policies contain exclusions arguably relevant to whether environmental cleanup costs are covered, we do not consider the applicability of exclusions in this case, which comes to us on motion for summary adjudication solely as to the coverage clauses. (See *post*, pp. 816-817.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE INSURANCE POLICIES

FMC holds over 60 primary and excess CGL policies issued by the insurers. Each policy contains one of three coverage clauses:

1. Policies issued by the Liberty Mutual Insurance Company and others provide coverage to FMC for "all sums which [FMC] shall become legally obligated to pay as damages because of . . . property damage to which this policy applies."

2. Policies issued by the FMC Insurance Company and others provide coverage to FMC for "all sums which [FMC] shall become obligated to pay by reason of the liability . . . imposed upon [FMC] by law . . . for damages on account of . . . property damage . . . ."[1]

3. Policies issued by the First State Insurance Company and others provide coverage to FMC for "all sums which [FMC] shall be obligated to

---

[1] FMC Insurance Company is a subsidiary of FMC. As such, it is not named as a defendant in this suit, although it issued policies to its parent corporation identical to those under which FMC seeks coverage here.

pay by reason of the liability . . . imposed upon [FMC] by law . . . for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of . . . property damages . . . ."[2]

These coverage provisions were adopted verbatim from standard CGL policies used by the insurance industry. (See Mountainspring, *Insurance Coverage of CERCLA Response Costs: The Limits of "Damages" in Comprehensive General Liability Policies* (1989) 16 Ecology L.Q. 755, 759; Chesler et al., *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Site Liability* (1986) 18 Rutgers L.J. 9, 53.) They contain several common elements. Each provision covers only sums that FMC is "legally obligated" or "obligated . . . by law" to pay. They each require that the sums paid be the result of FMC's liability for "property damage[s]." The first two policies limit coverage to sums paid as or for "damages." None of these terms is defined in any of the policies.[3] The only relevant definition contained in any of the policies is of "ultimate net loss" (covered by the third policy), which includes both "damages" and "expenses." (See *ante*, fn. 2.)

## B. THE THIRD PARTY SUITS AGAINST FMC

The United States and local administrative agencies (hereafter agencies) filed suits against FMC, seeking relief for alleged violations of CERCLA, the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f et seq.), and California's Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.). In sum, the suits allege that FMC is responsible for the contamination of 79 different hazardous waste disposal sites, groundwater beneath the sites, aquifers beneath adjoining property, and surrounding surface waters. The agencies seek two types of relief: (i) injunctions compelling FMC both to terminate disposal of further hazardous waste and to remove contaminants already present on

---

[2] The First State Insurance Company policies define "ultimate net loss" as "the total sum which [FMC] . . . become[s] obligated to pay by reason of . . . property damage . . . claims, either through adjudication or compromise, and shall also include . . . all sums paid as salaries, wages, compensation, fees, charges and law costs, . . . expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder . . . ."

[3] The FMC Insurance Company policies do note: "The term 'damages' includes damages for death and for care and loss of services resulting from personal injury and damages for loss of use of property resulting from property damage." Although the insurers briefly allude to this provision as a "definition" of "damages," we do not construe it as such. The provision states merely that "damages" *includes* certain specified items; there is no indication that this brief list is intended as a limit on definition of the term. (Cf. *National Indem. Co.* v. *U.S. Pollution Control Inc.* (W.D.Okla. 1989) 717 F.Supp. 765, 766.)

and around the disposal sites, and (ii) reimbursement of their costs of investigating, monitoring, and initiating cleanup of hazardous waste for which FMC allegedly is responsible.

All of the statutes on which the third party suits are based expressly authorize injunctive relief. (See CERCLA, 42 U.S.C. § 9606(a); RCRA, 42 U.S.C. § 6973(a); Clean Water Act, 33 U.S.C. § 1364(a); Safe Drinking Water Act, 42 U.S.C. § 300i(a); Hazardous Substance Account Act, Health & Saf. Code, § 25358.3, subd. (a).) CERCLA and the Hazardous Substance Account Act, however, also authorize government recovery of the costs of removing hazardous waste and restoring affected property, providing the agencies with a choice (subject to judicial approval) of how to proceed with and finance cleanup efforts. (See CERCLA, 42 U.S.C. § 9607(a)(4)(A) [reimbursement of government costs of removal or remedial action]; Hazardous Substance Account Act, Health & Saf. Code, § 25360 [reimbursement of state cleanup expenses].) In addition, CERCLA authorizes the federal government to recover sums for "damages to natural resources." (42 U.S.C. § 9607(a)(4)(C).) In their present suits against FMC, however, the agencies do not seek recovery under this last provision, although surface and groundwater nominally owned by the state (Wat. Code, § 102) has been damaged at many of the sites where remedial action is sought, and although CERCLA defines "natural resources" to include water and groundwater "belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by" the federal or state government.[4] (See CERCLA, 42 U.S.C. § 9601(16).)

C. THE PRESENT SUIT

In the present suit, FMC seeks declaratory relief establishing that the CGL policies cover costs it may become obligated to pay as a result of injunctive relief and/or reimbursement ordered in the third party suits. The insurers moved for summary adjudication, asserting that, as a matter of law, the CGL policies do not cover costs of abating and cleaning up hazardous waste and reimbursing governmental agencies for their cleanup efforts.[5] In response, FMC contended that (i) the policy language encompasses all of its costs resulting from the agencies' suits under CERCLA and the other

---

[4] Because the agencies do not seek recovery under the CERCLA "damages to natural resources" provision, we do not here directly consider whether such recovery would be covered by CGL policies. We note the existence of the provision, however, because the insurers in part rely on its existence to support their argument that recovery of response costs is mutually exclusive from recovery of statutory "damages." (See *post*, pp. 830-831.)

[5] Several private parties have also filed suit against FMC. We do not directly consider whether FMC's potential liability in these suits is covered by its CGL policies; the insurers seek summary adjudication only as to costs resulting from state and federal suits under the statutes identified above.

statutes, (ii) the intent of the parties to the policies is a relevant and contested issue of material fact bearing on the issue of coverage, and (iii) FMC should be granted preliminary discovery of evidence bearing on such intent.

The superior court denied the insurers' motion for summary adjudication and granted FMC preliminary discovery. Contrary to the insurers' contentions, the court reasoned that CGL policy language should be construed broadly and nontechnically, as ordinary principles of insurance policy interpretation direct. In this light, environmental cleanup costs, whether incurred directly by FMC pursuant to injunction or reimbursed to the government agencies, constitute "damages" and "ultimate net loss" which FMC will be "legally obligated" to pay because of "property damage." The court concluded it was immaterial that in strict legal terms FMC's obligation to incur costs pursuant to injunction will arise from the federal courts' exercise of "equitable" rather than "legal" authority, or that its reimbursement of government expenses can arguably be considered "restitution" rather than "damages."

The Court of Appeal reversed, issuing a peremptory writ of mandate directing the superior court to vacate its order denying summary adjudication of issues, and to enter in its place a new order granting such motion. Adhering to the position taken by two federal Courts of Appeals (*Continental Ins.* v. *Northeastern Pharmaceutical* (8th Cir. 1988) 842 F.2d 977, cert. den. 488 U.S. 821 [102 L.Ed.2d 43, 109 S.Ct. 66] (hereafter *NEPACCO*); *Maryland Cas. Co.* v. *Armco, Inc.* (4th Cir. 1987) 822 F.2d 1348, cert. den. 484 U.S. 1008 [98 L.Ed.2d 654, 108 S.Ct. 703] (hereafter *Armco*)), the court held that public policy considerations demand that the CGL policies be read technically, precluding coverage of the cost of "prophylactic" measures ordered under the equity jurisdiction of the courts. The court distinguished what it perceived to be the facts of this case—government action seeking to compel cleanup of FMC's *own land*—from situations in which waste has spread to property owned by the government or third parties.[6] Expressing no opinion about whether the expenses of removing waste in the latter situation may be covered under the policies, the court ruled that the costs of cleaning up property owned by FMC are not "damages" FMC is "legally obligated" to pay, because the third parties seeking relief (i.e.,

---

[6] As FMC points out, the Court of Appeal's understanding of the facts is somewhat puzzling. The third party suits allege not only contamination of the disposal sites themselves, but also of groundwater, surface water, and aquifers on and surrounding the sites. FMC cannot be considered the owner of such water. (See, e.g., Wat. Code, § 102 ["All water within the State is the property of the people of the State, but the right to use of water may be acquired by appropriation in the manner provided by law."].) Even if the Court of Appeal's distinction between property owned by FMC and that owned by third parties is meaningful, therefore, it misconstrues the factual posture of this case.

government agencies) have no compensable proprietary interest in the property sought to be cleaned up. On this basis, it distinguished this case from an earlier Court of Appeal decision, *Aerojet-General Corp.* v. *Superior Court* (1989) 211 Cal.App.3d 216 [257 Cal.Rptr. 621] (*Aerojet*), which held that CGL policies identical to those at issue here cover the cost of removing waste that had spread to third party and government-owned property.

We granted review to determine whether the Court of Appeal correctly directed the superior court to enter summary adjudication for the insurers.

## II. DISCUSSION

At issue here is whether, as a matter of law, the CGL policies cover either or both of the types of costs that FMC may be required to pay as a result of the third party suits. Specifically, we must determine whether (i) any adverse orders issued in those suits will "legally obligate" FMC to pay such costs, (ii) the costs will constitute "damages" or "ultimate net loss," and (iii) such costs will be incurred because of "property damage." Only if all three conditions are fulfilled will the insurers' duty to provide coverage arise under the policies.

Our task has two distinct parts. First, we must determine, under California law, what rules of insurance policy interpretation apply in this context. Second, we must interpret the CGL policies under applicable principles of insurance coverage. Although one can readily conceive of arguments for and against permitting insurance against the costs of rectifying pollution, at the outset we note that such arguments are not pertinent to either of our inquiries in this case. Both CERCLA and the Hazardous Substance Account Act expressly *permit* responsible parties to insure against the costs of relief available under the legislation. (See CERCLA, 42 U.S.C. § 9607(e); Health & Saf. Code, § 25364.) Thus, because Congress and the Legislature already have made the relevant public policy determinations, the issue before this court is not whether CGL policies *may* provide the coverage sought, but whether they *do* provide it according to their terms. The answer is to be found solely in the language of the policies, not in public policy considerations.

Numerous state and federal courts have addressed the issue presented in this case. Until the present Court of Appeal decision, nearly every state appellate decision has concluded that cleanup costs incurred under environmental statutes are covered by policies identical to those concerned here.[7]

---

[7]The facts of these cases are all substantially similar to those presented here. Although there is some variation in the precise nature and location of pollution sought to be remedied (e.g., whether it already spread to third party or government property, or was confined to the

(See, e.g., *Aerojet, supra*, 211 Cal.App.3d 216; *C.D. Spangler Construction Co.* v. *Industrial Crankshaft & Engineering Co., Inc.* (1990) 326 N.C. 133 [388 S.E.2d 557]; *Boeing Co.* v. *Aetna Casualty & Surety Co.* (1990) 113 Wn.2d 869 [784 P.2d 507] (*Boeing*); *Compass Ins. Co.* v. *Cravens, Dargan & Co.* (Wyo. 1988) 748 P.2d 724; *United States Fidelity & Guar. Co.* v. *Specialty Coatings Co.* (1989) 180 Ill.App.3d 378 [535 N.E.2d 1071], app. den. 545 N.E.2d 133 (*Specialty Coatings*); *Upjohn Co.* v. *New Hampshire Ins. Co.* (1989) 178 Mich.App. 706 [444 N.W.2d 813]; *CPS Chemical* v. *Continental Ins.* (1988) 222 N.J. Super. 175 [536 A.2d 311]; *Broadwell Realty* v. *Fidelity & Cas., supra*, 528 A.2d 76; *Waste Manag. of the Carolinas, Inc.* v. *Peerless Ins. Co.* (1984) 72 N.C.App. 80 [323 S.E.2d 726], revd. on other grounds 315 N.C. 688 [340 S.E.2d 374]; *United States Aviex Co.* v. *Travelers Ins. Co.* (1983) 125 Mich.App. 579 [336 N.W.2d 838].)

These decisions have generally held that the costs of reimbursing governments or third parties for their remedial and mitigative efforts are covered, either because such costs are plainly "damages" that the insured is "legally obligated" to pay as a result of "property damage" (see, e.g., *Boeing, supra*, 784 P.2d at p. 511; *Broadwell Realty* v. *Fidelity & Cas., supra*, 528 A.2d at p. 82), or because these phrases are ambiguous and therefore must be resolved in favor of coverage under ordinary rules of insurance policy interpretation (see, e.g., *Aerojet, supra*, 211 Cal.App.3d at p. 226; *Specialty Coatings, supra*, 535 N.E.2d at p. 1080). We have found only one state appellate decision holding to the contrary. (See *Braswell* v. *United States Fidelity & Guar. Co.* (1989) 300 N.C. 338 [387 S.E.2d 707].)

Similarly, state courts have consistently held costs of compliance with environmental injunctions covered, either because such costs fit within a broad definition of "damages" (see, e.g., *Specialty Coatings, supra*, 535 N.E.2d at pp. 1080-1081; *Waste Manag. of the Carolinas, Inc.* v. *Peerless Ins. Co., supra*, 323 S.E.2d at p. 735), or because a contrary holding would unreasonably make coverage hinge on the "mere fortuity" of which recovery mechanism (injunction, reimbursement, or "damages to natural resources") the government selects in enforcing CERCLA. (See, e.g., *United States Aviex Co.* v. *Travelers Ins. Co., supra*, 336 N.W.2d at p. 843.) Again,

---

insured's property), few decisions have given weight to such distinctions in the context of the basic coverage question presented here. When they have focused on the location of contamination, courts have done so largely in regard to an "owned property" exclusion contained in some CGL policies. Many courts have concluded that the costs of cleanup on the insured's own property are covered despite the exclusion. (See, e.g., *Gloucester TP* v. *Maryland Cas. Co.* (D.N.J. 1987) 668 F.Supp. 394, 400; *Fireman's Fund Ins. Companies* v. *Ex-Cell-O Corp.* (E.D.Mich. 1987) 662 F.Supp. 71, 75. But see *Broadwell Realty* v. *Fidelity & Cas.* (1987) 218 N.J. Super. 516 [528 A.2d 76, 82].) Although most of the policies at issue in this case contain such an exclusion, the insurers do not contend in this proceeding that the exclusion applies.

only one state appellate decision, in dictum, reaches the opposite conclusion. (See *CPS Chemical* v. *Continental Ins., supra,* 536 A.2d at p. 316.)

The federal courts, however, purporting to apply state law, are sharply divided on whether environmental cleanup costs are covered by CGL policies. Several courts have followed the majority of state decisions, concluding that both forms of relief sought by the government in statutory environmental suits constitute "damages" covered under the standard policies. (See, e.g., *Avondale Industries, Inc.* v. *Travelers Indem. Co.* (2d Cir. 1989) 887 F.2d 1200 [insurers' duty to *defend* suits seeking reimbursement of response costs]; *National Indemnity Co.* v. *U.S. Pollution Control Inc., supra,* 717 F.Supp. 765; *Chesapeake Utilities Corp.* v. *American Home Assur.* (D.Del. 1988) 704 F.Supp. 551; *Intel Corp.* v. *Hartford Acc. and Indem. Co.* (N.D.Cal. 1988) 692 F.Supp. 1171, app. pending 9th Cir. (*Intel*); *New Castle County* v. *Hartford Acc. & Indem. Co.* (D.Del. 1987) 673 F.Supp. 1359; *Gloucester TP* v. *Maryland Cas. Co., supra,* 668 F.Supp. 394; *U.S.* v. *Conservation Chemical Co.* (W.D.Mo. 1986) 653 F.Supp. 152.)

Other courts, however, have ruled that cleanup costs are not covered. These decisions all rely on one or more of four basic arguments. First, looking to the language of CERCLA itself, they often emphasize that because it contains separate provisions for government recovery of "damages" to natural resources (see 42 U.S.C. § 9607(a)(4)(C)) and of "remedial costs" compensating it for cleanup (*id.,* § 9607(a)(4)(A)), the latter form of recovery cannot be classified as "damages," notwithstanding whether state law principles would permit such a characterization in the absence of the statutory distinction. (See, e.g., *NEPACCO, supra,* 842 F.2d at p. 986; *Mraz* v. *Canadian Universal Ins. Co., Ltd.* (4th Cir. 1986) 804 F.2d 1325, 1329; *Verlan, Ltd.* v. *John L. Armitage & Co.* (N.D.Ill. 1988) 695 F.Supp. 950, 954; *Travelers Ins. Co.* v. *Ross Elec. of Washington, Inc.* (W.D.Wash. 1988) 685 F.Supp. 742, 744.)

Second, some courts have held, as the Court of Appeal did in this case, that because the agencies may recover their response costs without having suffered harm to property or resources in which they have a proprietary interest, such recovery is not for "damages," as that term is defined at law. (See, e.g., *Mraz* v. *Canadian Universal Ins. Co., Ltd., supra,* 804 F.2d at p. 1329; *Aetna Cas. & Sur.* v. *Gulf Resources & Chem. Corp.* (D.Idaho 1989) 709 F.Supp. 958, 962.)

Third, several decisions conclude that "damages," defined either in lay or legal terms, is an unambiguous term that does not include costs of complying with injunctive relief available under CERCLA and related statutes. Such costs, they reason, are not sums paid to another party to compensate it

for wrongs committed by the insured; they are simply "sums which the insured becomes legally obligated to pay because of property damage," failing to fulfill the "as damages" qualifier on coverage under CGL policies. Relying on decisions holding that an insured's costs of complying with mandatory injunctions issued in suits asserting common law claims are not "damages" (see, e.g., *Garden Sanctuary, Inc.* v. *Insurance Co. of No. Amer.* (Fla.Dist.Ct.App. 1974) 292 So.2d 75; *Aetna Casualty and Surety Company* v. *Hanna* (5th Cir. 1955) 224 F.2d 499 (*Hanna*); *Desrochers* v. *New York Casualty Co.* (1954) 99 N.H. 129 [106 A.2d 196]), these courts have held that the costs of compliance with environmental injunctions should be treated no differently. (See, e.g., *NEPACCO, supra,* 842 F.2d at p. 986; *Armco, supra,* 822 F.2d at p. 1353.)

Fourth, several courts have reasoned that the costs of injunctions and reimbursement are not covered because, in the corporate "insurance context," insureds should not receive the benefit of insurance policy interpretation principles designed to protect unsophisticated, arguably disadvantaged policyholders. (See, e.g., *NEPACCO,* 842 F.2d at pp. 985-986; *Armco, supra,* 822 F.2d at p. 1352; *Hayes* v. *Maryland Cas. Co.* (N.D.Fla. 1988) 688 F.Supp. 1513, 1515; *Travelers Ins. Co.* v. *Ross Elec. of Washington, Inc., supra,* 685 F.Supp. at p. 745.) Under this view, courts should interpret CGL policies by affording them narrow legal meanings under which the terms "legally obligated" and "damages" exclude the costs of *equitable* relief from coverage. Classifying reimbursement of government cleanup costs as equitable "restitution" and costs of compliance with injunctions as a consequence of equitable relief, several courts have concluded for this reason that neither type of relief is covered. (See, e.g., *Cincinnati Ins. Co.* v. *Milliken and Co.* (4th Cir. 1988) 857 F.2d 979, 981; *Verlan, Ltd.* v. *John L. Armitage & Co., supra,* 695 F.Supp. at pp. 953-955.)

As these decisions suggest, two general arguments underlie the insurers' position that expenses incurred under CERCLA and similar statutes are not covered by the CGL policies at issue. First, it is argued that established rules of insurance policy interpretation are inapplicable in this context, and that we should apply more restrictive principles that will preclude coverage of environmental response costs under these policies. Second, even under traditional principles of interpretation, the policies should be interpreted to unambiguously exclude coverage of the types of relief sought in the underlying suits. We examine these propositions in turn.

A. PRINCIPLES OF INSURANCE POLICY INTERPRETATION

Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ.

Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.) ■ Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. (See, e.g., *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764]; *Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].)

If there is ambiguity, however, it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. (Civ. Code, § 1649.) If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. (*Id.*, § 1654.) ■ In the insurance context, we generally resolve ambiguities in favor of coverage. (See, e.g., *State Farm Mut. Auto. Ins. Co.* v. *Jacober* (1973) 10 Cal.3d 193, 197 [110 Cal.Rptr. 1, 514 P.2d 953]; *Bareno* v. *Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 878 [103 Cal.Rptr. 865, 500 P.2d 889]; *Continental Casualty Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801, 57 A.L.R.2d 914].) ■ ■ ■ ■ ■ Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured.[8] (See, e.g., *Garvey* v. *State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 406 [257 Cal.Rptr. 292, 770 P.2d 704]; *Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d at p. 808.) These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. (See, e.g., *Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 438 [204 Cal.Rptr. 435, 682 P.2d 1100]; *Bareno, supra,* 7 Cal.3d at p. 878.) Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage.

---

[8] Although our focus is the expectations of the insured at the time the policy is made, this emphasis does not preclude coverage of forms of liability—such as those at issue here—created after the formation of the policy. Because the policies in question here are "comprehensive," it was within the insured's reasonable expectation that new types of statutory liability would be covered, as long as they were within the ambit of the language used in the coverage provision. As one court has pointed out, failure to cover new liabilities would create a "discordant result, for it would mean that where courts enlarge liability during the effective period of a liability policy, an insured who contracted for complete coverage of a possible risk would be left without coverage because the scope of the risk had been enlarged by decisional law." (*Travelers Ins. Co.* v. *Industrial Indem. Co.* (1971) 18 Cal.App.3d 628, 632 [96 Cal.Rptr. 191].) The same is true when legislatures create entirely new forms of liability. The sole relevant inquiry in determining whether such types of liability are covered is whether, in view of the reasonable expectations of the insured, policy language can be interpreted to embrace the liability that may accrue under new statutory schemes.

It follows, however, that where the policyholder does not suffer from lack of legal sophistication or a relative lack of bargaining power, and where it is clear that an insurance policy was actually negotiated and jointly drafted, we need not go so far in protecting the insured from ambiguous or highly technical drafting. (*Garcia* v. *Truck Ins. Exchange, supra,* 36 Cal.3d at p. 438 [refusing to resolve ambiguity against insurer when insured enjoyed "substantial bargaining power vis-à-vis the carrier," and actually negotiated and joined in drafting terms of coverage]; see also 13 Appleman, Insurance Law and Practice (1981) § 7402, pp. 300-301 ["it has been held that the principle that ambiguities in insurance policies should be strictly construed against the insurer need not be strictly adhered to in instances where one large corporation and one large insurance company both advised by competent counsel do business with each other"].)

■ FMC unquestionably possesses both legal sophistication and substantial bargaining power. For this reason, the insurers contend, we should neither construe the policy language at issue in this case in the broad sense understood by laypersons (as opposed to a narrower technical sense) nor resolve ambiguities in favor of coverage. There is some force to these arguments, particularly in light of the fact that FMC itself operates a subsidiary that drafts CGL policies identical to those at issue in this case. In the absence of evidence that the parties, at the time they entered into the policies, intended the provisions at issue here to carry technical meanings and implemented this intention by specially crafting policy language, however, we see little reason to depart from ordinary principles of interpretation. Similarly, in the absence of evidence that the insurers had cause to believe, at the time of formation, that FMC understood policy language in any technical or restrictive manner, we decline to depart from the settled rule that ambiguities are resolved against the party responsible for their inclusion in the policies.

We deem this party to be the insurers. They have presented no evidence suggesting that the provisions in question were actually negotiated or jointly drafted.[9] (Compare *Garcia* v. *Truck Ins. Exchange, supra,* 36 Cal.3d at p.

---

[9] The insurers have submitted evidence (specifically, an internal FMC memorandum stating that the policies were written "on a line-per-line basis through continuing negotiation with the insurance carrier") that FMC individually negotiated the policies in question. This evidence does not, however, shed light on the meaning to be ascribed to the coverage provisions at issue here. These provisions, as we have noted above, are adopted verbatim from standard form policies used throughout the country. For this reason, even if the policies were "negotiated" in a broad sense, this fact has little bearing on construction of the specific policy language in question here.

In addition, both the insurers and FMC have requested that we take judicial notice of documents allegedly indicating the view the other has taken of the CGL policies in connection with litigation and activities unrelated to this case. Because our focus here is on the intent of

434.) Indeed, the evidence that is before us reveals that such provisions, drafted by the insurers, are highly uniform in content and wording. For the above reasons, we interpret their contents, if ambiguous, in favor of coverage.

## B. INTERPRETATION OF CGL POLICY LANGUAGE

The CGL policies at issue in this case cover sums which FMC becomes "legally obligated" to pay as "damages" (or "ultimate net loss") incurred because of "property damage." We next consider whether, as a matter of law, the types of relief at issue in the third party suits satisfy these requirements.

### 1. "Legally Obligated"

■ The first requirement for coverage is that FMC be legally obligated to pay the costs at issue. Because it is clear that, if FMC is held liable in the third party suits, it will be "obligated" to pay for whatever relief the courts order, the only remaining question is whether that obligation may be considered "legal" under applicable rules of interpretation.[10] The insurers contend it may not, for the simple reason that whether the courts award injunctive relief or order FMC to reimburse the agencies for their response costs, they will be exercising "equitable" rather than "legal" authority.

Both injunctions and awards of response costs under CERCLA reasonably can be viewed as equitable relief. (See, e.g., *United States* v. *Northeastern Pharmaceutical* (8th Cir. 1986) 810 F.2d 726, 749, cert. den. (1987) 484 U.S. 848 [98 L.Ed.2d 102, 108 S.Ct. 146] [no right to jury trial in suit seeking reimbursement of response costs]; *In re Acushnet River & New Bedford Harbor Proceed.* (D.Mass. 1989) 712 F.Supp. 994, 1001 [no right to jury trial in suit for injunction and reimbursement of response costs under

---

the parties at the time the policies were formed, the evidence contained in these documents is immaterial to our decision. For this reason, the requests for judicial notice are denied. (Evid. Code, § 459.)

[10] Undoubtedly, when a court orders an insured to take remedial measures pursuant to injunction, it leaves the insured relatively free to choose how to achieve the stated remedial goal. In this respect, it can be argued that the injunction does not "obligate" the insured to expend any specific sum of money. Indeed, some courts have expressed the fear that if courts mandate coverage of such costs, insureds will acquire the incentive to overspend for remedial measures. (See, e.g., *Armco, supra,* 822 F.2d at p. 1353.)

We accept neither of these arguments. The first ultimately fails when examined in light of our focus on the reasonable expectations of the insured. (See *ante,* p. 822 & fn. 8.) As long as an injunction requiring cleanup ostensibly requires the insured to expend any sum of money, we believe a reasonable interpretation provides that the insured is "obligated" to pay the actual costs attributable to cleanup. The second argument rests on considerations of public policy, which we reserve for Congress and the Legislature.

CERCLA]; *United States* v. *Dickerson* (D.Md. 1986) 640 F.Supp. 448, 451 [statute of limitations and right to jury do not apply to suit for recovery of response costs under CERCLA].) The mere characterization of relief under federal law, however, is not dispositive of the proper construction of insurance policies under state law. Because California has generally abandoned the traditional distinction between courts of equity and courts of law (see Code Civ. Proc., §§ 24, 30; *Aerojet, supra,* 211 Cal.App.3d at pp. 230-231, fn. 8), even a legally sophisticated policyholder might not anticipate that the term "legally obligated" precludes coverage of equitably compelled expenses. Because the relief is ordered by a court of law, as that term is used in the modern sense, FMC could reasonably believe that its obligation to pay is legal. As the Court of Appeal noted in *Aerojet, supra,* 209 Cal.App.3d at page 228: "[P]etitioners would be surprised indeed to learn that coverage depended on whether the proceeding employed to obtain recompense was defined as 'legal' or 'equitable.' . . . It would come as an unexpected, if not incomprehensible, shock to the insureds to discover that their insurance coverage was being denied because the plaintiff chose to frame his complaint in equity rather than in law." Thus, as a matter of plain meaning, the term "legally obligated" covers injunctive relief and recovery of response costs.

Moreover, even if this phrase raises doubts in the minds of legally trained observers about whether a law-equity distinction was intended, it would be unreasonable to conclude that it unambiguously incorporates this sophisticated distinction into the policies. In this respect, whatever ambiguity it possesses in light of a party's legal knowledge is resolved in favor of coverage. (See *ante,* p. 822.) Whether the term "legally obligated" is ambiguous or not, therefore, we conclude that it encompasses the types of relief sought in the third party suits.

## 2. *"Damages"*

We next consider whether FMC's prospective legal obligation in the third party suits is to pay "damages." Because the CGL policies do not define the word "damages," for interpretation purposes we look to its "ordinary and popular" definition. (Civ. Code, § 1644; *Allstate Ins. Co.* v. *Thompson* (1988) 206 Cal.App.3d 933, 938 [254 Cal.Rptr. 84].) Section 3281 of the Civil Code provides: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." ▮ As our cases have pointed out, this provision is intended to represent the plain and ordinary meaning of the word "damages." (See, e.g., *Hoban* v. *Ryan* (1900) 130 Cal. 96, 99 [62 P. 296]; *Wainscott* v. *Occidental Bldg. & Loan Assn.* (1893) 98 Cal. 253, 255 [33 P. 88].) Other lay and legal definitions are

similar. One dictionary, for example, defines "damages" as "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." (Webster's New Internat. Dict. (3d ed. 1981) p. 581.) Black's Law Dictionary similarly defines "damages" as "[a] pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission of another." (Black's Law Dict. (4th ed. 1951) p. 466, col. 2.) Whatever their semantic differences, the statutory and dictionary definitions of "damages" share several basic concepts. Each requires there to be "compensation,"[11] in "money," "recovered" by a party for "loss" or "detriment" it has suffered through the acts of another.[12]

The courts have generally applied similar definitions for insurance purposes. (See, e.g., *Jaffe* v. *Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 935 [214 Cal.Rptr. 567] [" 'damages' describes a payment made to compensate a party for injuries suffered"]; *Specialty Coatings, supra,* 535 N.E.2d at p. 1080 [applying dictionary definition]; *National Indem. Co.* v. *U.S. Pollution Control Inc., supra,* 717 F.Supp. at p. 767 [applying dictionary definition]; *Intel, supra,* 692 F.Supp. at p. 1189 [applying Cal. statutory definition]; *New Castle County* v. *Hartford Acc. & Indem. Co., supra,* 673 F.Supp. at p. 1365 [applying dictionary definition].)

Several courts, however, have declined to apply dictionary or statutory definitions. At one end of the spectrum, some decisions have used narrower technical meanings, focusing on the distinction between law and equity. (See, e.g., *Armco, supra,* 822 F.2d at p. 1352 [" 'Damages,' as distinguished from claims for injunctive or restitutionary relief, includes 'only payments to third persons when those persons have a legal claim for damages.' "].) For purposes of California law, which interprets policy language in its "ordinary and popular" sense unless the parties expressed an intent other-

[11] Although these definitions employ the word "compensation," we do not construe this term in its technical legal sense. (Civ. Code, § 1644; see also *id.*, § 3333 [establishing measure of "compensatory" damages].) Rather, we take it to encompass any remunerative payment made to an aggrieved party. In addition to "compensatory damages," as we explain more fully below, the term "damages" generically includes restitutive and punitive measures. (See, e.g., *McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 363 [261 Cal.Rptr. 318, 777 P.2d 91] [discussing "recovery of his claimed damages (restitutive, compensatory, and punitive)"].)

[12] FMC suggests that an even broader definition should be applied. In support, it cites dictionary definitions of "damage" simply as "expense" or "cost." (See, e.g., Webster's New Collegiate Dict. (9th ed. 1986) p. 323.) In our view, this definition is colloquial, as the illustrations offered by these dictionaries point out. Indeed, they also provide a separate definition of the plural "damages." This definition is substantially the same as those we have quoted above. (See *ibid.* ["pl: compensation in money imposed by law for loss or injury"].)

wise (Civ. Code, § 1644), we decline to follow this approach. Defining "damages" as sums paid to third persons as a result of "legal claims" would render the policy language at issue here redundant as well as inconsistent with an ordinary interpretation of the word "damages"; if the policies are construed in this manner, the phrase "legally obligated to pay" would have no meaning not already expressed by the subsequent phrase providing coverage of "damages." Under established principles, we decline to apply a definition that would create this result. (See Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].)

At the other end of the spectrum, some courts have applied definitions broader than the statutory or dictionary definitions described above. In *Aerojet, supra,* 211 Cal.App.3d at page 226, the Court of Appeal rejected the statutory and dictionary definitions, reasoning that "from the standpoint of the lay insured, 'damages' could well include any sum expended under sanction of law . . . . [T]he insured may reasonably expect coverage for any sums expended, either at law or equity, as a result of the insured's causing property damage to another." (*Ibid.*; see also *U.S. Fidelity and Guar. Co.* v. *Thomas Solvent Co.* (W.D.Mich. 1988) 683 F.Supp. 1139, 1168 ["it seems to me that the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely the rights of third parties."]; *New Castle County* v. *Hartford Acc. & Indem. Co., supra,* 673 F.Supp. at p. 1366 ["Since the required remedial actions were ultimately enforceable in a legal proceeding, they constituted sums that the County was legally obligated to pay as damages."]; *Fireman's Fund Ins. Companies* v. *Ex-Cell-O Corp., supra,* 662 F.Supp. at p. 75 ["coverage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder."].) This definition includes the basic concepts of "loss" or "detriment" recognized in the statutory and dictionary definitions, but omits any requirement that the expenditure incurred as a result of such loss be "compensation" provided to an aggrieved party.

Although we agree that a layperson might reasonably define "damages" in such broad terms, it is unlikely that he would do so in the context of the coverage provision at issue here, taken as a whole. In this respect, the *Aerojet (supra,* 211 Cal.App.3d 216) definition suffers from the same defect as the narrow one discussed above. It essentially construes damages as "all sums the insured becomes legally obligated to pay because of property damage." CGL policies, however, cover "all sums which the insured becomes legally obligated to pay *as damages* because of property damage."

(Italics added.) As several courts have noted, defining "damages" in the broad sense accepted by *Aerojet* would effectively render the phrase "as damages" meaningless. (See, e.g., *NEPACCO, supra,* 842 F.2d at p. 986; *Armco, supra,* 822 F.2d at p. 1352.) For this reason, we hesitate to apply the *Aerojet* definition. (See Civ. Code, § 1641.)

We note, however, that CERCLA and the Hazardous Substance Account Act authorize alternative remedies—injunction and reimbursement—that are relatively interchangeable in a way perhaps not foreseen by the parties at the time they entered the CGL policies. As we discuss at greater length below, the policies necessarily present some ambiguity in light of statutory schemes that by their very operation tend to eliminate the formal distinction between compensation paid to an aggrieved party and sums expended by the insured under compulsion of injunction. (See *post,* p. 840.) For this reason, although we take the statutory and dictionary definitions described above to be the "ordinary and popular" definition of "damages" for interpretation purposes, we will not apply this definition inflexibly. To the extent that policy language is ambiguous in light of the way environmental statutes authorize relief, our goal remains to protect the objectively reasonable expectations of the insured. (See, e.g., *Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d at p. 808.)

With this background, we now examine whether the basic forms of relief at issue in the underlying suits are "damages."

(a) *Reimbursement of government response costs*

█ In numerous CERCLA suits seeking recovery from responsible parties, courts have routinely referred to reimbursement of response costs as "damages," regardless of the nature of the cleanup performed or property interest possessed by the plaintiff. (See, e.g., *Pennsylvania* v. *Union Gas Co.* (1989) 491 U.S. 1, 19-20 [105 L.Ed.2d 1, 19-20, 109 S.Ct. 2273, 2284-2285]; *Wickland Oil Terminals* v. *Asarco, Inc.* (9th Cir. 1986) 792 F.2d 887, 890; *Jones* v. *Inmont Corp.* (S.D.Ohio 1984) 584 F.Supp. 1425, 1429.) In the insurance context, this view is persuasive. The ordinary, nontechnical meaning of "damages," as stated by statute and dictionaries and used by the courts in related contexts, encompasses reimbursement of response costs. The agencies' expenditure of federal funds to investigate and initiate cleanup of hazardous waste constitutes "loss" or "detriment." Furthermore, reimbursement by responsible parties is monetary "compensation" for such loss.

The first element of the statutory and dictionary definitions of "damages" is fulfilled in this case. The agencies suffer "loss" or "detriment" in two

separate ways when they incur response costs under CERCLA and similar statutes. First, release of hazardous waste into groundwater and surface water constitutes actual harm to property in which the state and federal governments have an ownership interest; this harm is "detriment" in statutory terms. (Civ. Code, § 3282; Wat. Code, § 102 ["All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law."].) Second, the agencies' out-of-pocket expenses of investigating and removing the waste as required by statute is "loss" incurred as a direct result of harm allegedly created through the unlawful act or omission of FMC.

Viewed in this second context, such expenditure constitutes "loss" or "detriment" even as to agency efforts specifically directed at cleaning up property in which neither the state nor the federal government has an ownership interest. Under statute, the agencies are charged with the duty of removing hazardous waste, whether or not their proprietary interests are harmed or they ultimately are compensated for their efforts. They are not mere contractors who act out of an expectation of recompense for their cleanup work; their expenses are incurred as a matter of public duty rather than hope of private gain. Thus, when they seek reimbursement of their response costs, the basis of the claim is harm done to the public fisc. In ordinary terms, such harm constitutes "loss" or "detriment."

The language of the CGL policies themselves supports this view. The clauses at issue here cover sums expended as damages "because of property damage." If "damages" is construed to include a requirement that the aggrieved party suffered harm to a proprietary interest in the damaged property, the latter phrase becomes redundant. The plain language of the policies therefore supports the conclusion that the agencies' out-of-pocket expenditures, irrespective of the government interest in the property sought to be cleaned up, constitute "loss" or "detriment."

The second element of the statutory and dictionary definitions of "damages" is also fulfilled in this case. FMC's reimbursement of government response costs is monetary "compensation" for the loss suffered by the agencies when they proceed with environmental cleanups. Moreover, because the compensable loss is all remedial out-of-pocket expenditures incurred by the agencies, the "compensation" sought from FMC includes reimbursement for costs of cleaning up existing contamination on and off the disposal site itself, investigating the extent of contamination or the viability of cleanup options, and monitoring the spread of waste from the site. (See, e.g., *Intel, supra,* 692 F.Supp. at p. 1192.) As long as some "property damage," as defined below, has already taken place, the agencies' expenses for responding constitute loss or detriment, whether or not the

expenses are attributable to actual cleanup, mitigation of damage, or investigation and monitoring. When the agencies seek reimbursement of such expenses from the insured under CERCLA, their claim is for compensation for all their expenses, not merely those resulting from actual cleanup efforts on government property. Any other conclusion would be illogical as a matter of the reasonable expectations of the insured. (See *Aerojet, supra,* 211 Cal.App.3d at p. 227; *Globe Indem. Co. v. State of California* (1974) 43 Cal.App.3d 745, 751 [118 Cal.Rptr. 75].)

For three specific reasons not relating to the ordinary meaning of the word "damages," however, the insurers contend that a reasonable interpretation excludes reimbursement of response costs from coverage under the CGL "damages" provision. First, they argue that because CERCLA distinguishes response costs from damages, it mandates the same distinction in the insurance context because the agencies do not seek "damages" as prescribed by statute. Second, the insurers contend that because environmental statutes authorize the agencies to recover response costs even if they suffer no property damage or personal injury, such recovery is "a government-imposed cost of doing business" rather than compensation for loss or detriment. Finally, the insurers contend that reimbursement is best characterized as restitutive relief, the measure and purpose of which is sufficiently different from "damages" to render the two concepts mutually exclusive. None of these arguments is persuasive in the insurance context.

(i) *Statutory distinctions between "response costs" and "damages."* ■ CERCLA expressly distinguishes between recovery of "response costs" and recovery of "damages to natural resources." (See 42 U.S.C. § 9607(a).) The difference between the two types of recovery and the way they are to be measured by the courts, however, is neither clearly laid out in the statute itself nor fully explained in its sparse legislative history. On the one hand, several sections of the statute suggest that "response costs" are essentially a subset of "damages." (See, e.g., *id.*, § 9607(f)(1) [providing that measure of "damages to natural resources" shall "not be limited to the sums which can be used to restore or replace such resources"].) On the other hand, statements made during legislative debate regarding the remedies provisions suggest that government recovery of damages to natural resources is limited to the lesser of the diminution in value of the natural resources in question or the cost of restoring such resources. (See *State of Idaho v. Bunker Hill Co.* (D.Idaho 1986) 635 F.Supp. 665, 675-676 [quoting statements of Sen. Simpson].)

However damages and response costs are measured, we do not believe, as the insurers contend and several courts have concluded (see, e.g., *NEPACCO, supra,* 842 F.2d at p. 986; *Mraz v. Canadian Universal Ins. Co., Ltd.,*

*supra,* 804 F.2d at p. 1329), that CERCLA intended that reimbursement of "response costs" be treated as definitionally or conceptually distinct from recovery of "damages." Congress clearly intended considerable overlap between the two forms of recovery. It is clear that response costs can, in certain situations, be recovered as "damages" to natural resources. (See, e.g., *United States* v. *Shell Oil Co.* (D.Colo. 1985) 605 F.Supp. 1064, 1084-1085, fn. 10.) Indeed, one court recently held that the cost of restoration is the proper measure of statutory "damages," even if greater than the diminution in value of harmed property. (See *State of Ohio* v. *U.S. Dept. of the Interior* (D.C. Cir. 1989) 880 F.2d 432, 459.) Seen in this light, whether recovery of remedial costs is sought under the "response cost" subdivision or that allowing recovery for "damages to natural resources," it can be construed to fall within the scope of the insurance policies at issue here. Moreover, we fail to see how the distinction made by CERCLA between "response costs" and "damages *to natural resources*" forecloses response costs from being characterized as "damages" in a generic sense under CGL policies.

More significantly, our ultimate conclusion as to whether reimbursement of response costs is "damages" for insurance purposes is, as noted above, predominantly a question of how, under *state law,* insurance policies should be interpreted. (Cf. *Aerojet, supra,* 211 Cal.App.3d at p. 235; *Chesapeake Utilities Corp.* v. *American Home Assur., supra,* 704 F.Supp. at p. 560; *Intel, supra,* 692 F.Supp. at pp. 1186-1187; *Specialty Coatings, supra,* 535 N.E.2d 1071, 1080.) We are not bound by distinctions or definitions contained in CERCLA itself, if such distinctions do not reflect the intent of the parties to the CGL policies at the time of their formation. For this reason, even to the extent that CERCLA distinguishes between response costs and damages, this fact seems immaterial to the interpretation question at issue in this case. The parties' intent in entering the CGL policies could not possibly have been influenced by the niceties of statutory language adopted many years after the policies were drafted.

### (ii) *Reimbursement of response costs as a cost of doing business.*

The insurers also contend that FMC's reimbursement of response costs does not constitute "damages" because it does not depend on the incidence of any tangible harm to government property. Instead, they argue, such reimbursement is merely a cost of complying with the regulatory objectives of government agencies, and in this sense is an uninsurable cost of doing business instead of "compensation" for "detriment" suffered by the agencies. As one court has concluded, "[u]nder CERCLA, the rule is simply that he who releases hazardous substances must pay for the cleanup. In other words, response costs are simply a government-imposed cost of doing business for firms which release hazardous substances. Such costs are not

covered by CGL policies, any more than the cost of installing fire extinguishers as required by the Occupational Safety and Health Administration would be covered." (*Aetna Cas. & Sur.* v. *Gulf Resources & Chem. Corp., supra,* 709 F.Supp. at p. 962.) In *Armco, supra,* 822 F.2d 1348, the Fourth Circuit Court of Appeals focused on this argument in holding that reimbursement of response costs under CERCLA is not covered by CGL policies: "From an insurer's perspective, investigative and remedial action taken by the government respecting potential environmental hazards constitutes a prophylactic measure . . . . [In this case, the government] has intervened immediately upon learning of the toxic contamination. The case thus presents no instance of harm to human or animal life, but merely the prevention of such harm." (*Id.* at pp. 1353-1354.)

As reflected by *Aetna Cas. & Sur.* v. *Gulf Resources & Chem. Corp.* and *Armco,* the argument that reimbursement of response costs is uninsurable has two strands, both emanating from the fact that government agencies rather than private landowners are the parties seeking reimbursement. First, government agencies have only a regulatory interest in the property sought to be cleaned up. Second, the response they seek is prophylactic in nature, and therefore cannot be the subject of insurance.

Neither of these arguments possesses merit in the context of the environmental cleanups at issue here. The first contention fails to take into account the principles that guide interpretation of insurance policies. An ordinary definition of "damages" does not necessarily focus on the aggrieved party's proprietary interest; it is sufficient that the party have suffered some detriment, purely regulatory though it may be, that is compensable by an award from a responsible party. (See *ante,* pp. 828-829.)

Although the second argument has some merit in the abstract, it misperceives the nature of the response costs sought by the agencies in most hazardous waste cases, including this one. As is discussed below, it is true that government regulations or court orders requiring businesses such as FMC to undertake purely prophylactic measures designed to prevent future discharges of hazardous waste result in costs that are not covered by CGL policies. Such government actions are distinguishable, however, from the reimbursement sought by the agencies here, as well as that in cases such as *Armco, supra,* 822 F.2d 1348. In our view, the *Armco* approach to what constitutes "damages" for insurance policy purposes is unduly narrow. In many contexts, a party may recover "damages" without any "harm to human or animal life" having occurred. The absence of such harm does not vitiate the loss incurred by the agencies in undertaking remedial measures.

Because the third party suits here (like that at issue in *Armco*) rest on allegations of past and present damage to land and water on and surround-

ing hazardous waste sites, they concern reimbursement not for prophylactic purposes, but rather for remedial and mitigative actions.[13] Recovery of the costs of both types of measures is "damages" in ordinary terms. A release of hazardous waste constitutes an "unlawful act or omission" that causes "detriment" to government interests (i.e., out-of-pocket loss), and reimbursement of response costs is "compensation therefor in money."

Thus, even if government response costs are incurred largely to prevent damage previously confined to the insured's property from spreading to government or third party property (i.e., the costs are "mitigative" in character), reimbursement of such costs constitutes "damages" in ordinary terms. A contrary result would fail to fulfill the reasonable expectations of the parties. (See *Aerojet, supra,* 211 Cal.App.3d at p. 227, citing *Globe Indem. Co.* v. *State of California, supra,* 43 Cal.App.3d at p. 751 [it would "seem strangely incongruous" to the insured "that his policy would cover him for damages to tangible property destroyed through his negligence in allowing a fire to escape but not for the sums incurred in mitigating such damages by suppressing the fire"]; *Goodyear Rubber & Supply* v. *Great Am. Ins. Co.* (9th Cir. 1976) 545 F.2d 95, 96 ["It would be a strange kind of justice, and a stranger kind of logic, that would hold the defendant to be liable for as much as $450,000 if the barge and its contents had been consumed by fire, but free of liability for a much lesser amount because of the fortuity of rescue."]; *Intel, supra,* 692 F.Supp. at p. 1192; *Bankers Trust Co.* v. *Hartford Acc. & Indem.* (S.D.N.Y. 1981) 518 F.Supp. 371, 373-374; *Leebov* v. *United States Fidelity and Guaranty Co.* (1960) 401 Pa. 477 [165 A.2d 82, 84].) For this reason, we consider it immaterial to the issue before us whether or not the agencies, in seeking reimbursement of response costs, have suffered harm to a proprietary interest. Unlike the situation when agencies seek prophylactic measures, reimbursement of environmental response costs—whether incurred for remedial or mitigative purposes—is not an uninsurable cost of doing business.[14]

---

[13] The statutes authorize the agencies to seek injunctive relief that may be prophylactic in character, but this relief is not the subject of reimbursement under the statutory response costs provisions. We address below whether such costs stemming from injunctive relief are "damages" under CGL policies.

[14] The Court of Appeal in this case reasoned that reimbursement of mitigation costs should not be covered because it does not "compensate the injured property owner for his loss of value or loss of use of the property." (Cf. *Farr* v. *Traders & General Insurance Company* (1962) 235 Ark. 185 [357 S.W.2d 544] [reimbursement of mitigation costs not covered under CGL policy because extent of damage in absence of mitigation was speculative, and "judgments cannot be based on speculation"].) Although it is true that mitigation per se is not a necessary incident of property damage, we do not agree with the Court of Appeal that its costs should be excluded from CGL coverage on this basis. As the aforementioned decisions persuasively conclude, it would be illogical for mitigation costs not to be covered and remedial costs to be covered. Moreover, as we note above (see *ante,* pp. 832-833), because the "detriment" at issue in the CERCLA response cost context is the agencies' out-of-pocket expenses rather than any

(iii) *Reimbursement of response costs as restitution.* The insurers contend that reimbursement of response costs is "restitution," which they view as mutually exclusive from "damages." This argument has two separate thrusts: one going to the *measure* of the types of relief at issue, and one concerning the fundamental *character* of such relief. The flaw in the insurers' contention is that neither of these strands takes into account the ultimate considerations underlying judicial interpretation of insurance policies. Even if recovery of response costs is technically "restitution" rather than "damages," this fact is of little consequence to policy interpretation in the absence of evidence on the face of the policies that technical distinctions were intended.

The insurers' argument as to the measure of relief is as follows: recovery of common law "damages" is limited to the lesser of the diminution in value of property harmed or the costs of repair. Reimbursement of response costs, however, resembles the costs of repair, which may be higher than diminution in the value of property. If costs of repair exceed the value of damaged property (as they often may under CERCLA), either the entire recovery or, at a minimum, the excess cannot be considered "damages" because it exceeds the actual harm to the plaintiffs' property. (See, e.g., *NEPACCO, supra,* 842 F.2d at pp. 986-987; *Travelers Ins. Co.* v. *Ross Elec. of Washington, Inc., supra,* 685 F.Supp. at p. 744; *Hanna, supra,* 224 F.2d at p. 503.)

The insurers' argument contains several flaws. First, recovery of tort damages is not invariably limited by the value of damaged property. The courts have recognized that recovery in excess of such value may be necessary to restore the plaintiff to the position it occupied prior to a defendant's wrongdoing. (See, e.g., *Heninger* v. *Dunn* (1980) 101 Cal.App.3d 858, 863 [162 Cal.Rptr. 104] [permitting recovery of reasonable repair costs in excess of value of damaged property, when plaintiff has personal reason for making repairs]; *Dandoy* v. *Oswald Bros. Paving Co.* (1931) 113 Cal.App. 570, 572-573 [298 P.1030] ["To hold that appellant is without a remedy merely because the value of land has not been diminished, would be to decide that by wrongful act of another, an owner of land may be compelled to accept a change in the physical condition of his property, or else perform the work of restoration at his own expense. This would be a denial of the principle that there is no wrong without a remedy."]; see generally Rest.2d Torts, § 929.)

Second, even if the courts generally award tort "damages" in an amount limited to the lesser of the value of damaged property or the costs of repair, that does not mandate that a greater recovery authorized by state or federal

___

tangible harm to property, for statutory purposes expenses attributable to mitigation constitute "detriment" just as much as remedial costs.

statutes therefore should be held to constitute something other than "damages" in conceptual terms. (See *State of Ohio* v. *U.S. Dept. of the Interior, supra,* 880 F.2d at p. 459.) Even if a court applying common law might not award the full extent of such costs, the excess above what is awarded remains "damages" for insurance policy interpretation purposes. The whole recovery of response costs, not just the amount limited to the value of harmed property, constitutes loss or detriment for harm caused by FMC's allegedly unlawful act or omission.

This brings us to the alternative thrust of the insurers' argument: reimbursement of government response costs is not "damages" because it is a restitutive remedy that is "specific" rather than "substitutive" in character. The United States Supreme Court recently adopted this distinction in discussing whether a state's claim for "reimbursement" of federal Medicaid subsidies is a claim for "money damages" under the terms of the Administrative Procedure Act (APA) (5 U.S.C. § 702). Characterizing such a claim as one for "restitution," the high court held that it was therefore not a claim for money damages: "Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing . . . for 'the recovery of specific property *or monies* . . . .' " (*Bowen* v. *Massachusetts* (1988) 487 U.S. 879, 893 [101 L.Ed.2d 749, 763, 108 S.Ct. 2722] [citation omitted, italics in original]; see also *Maryland Dept. of Human Resour.* v. *Dept. of H.H.S.* (D.C. Cir. 1985) 763 F.2d 1441, 1446 ["the term 'money damages' [under the APA] . . . normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.' [Citation omitted.]"].)

We, too, have recognized a distinction between restitution and compensatory damages. (See *McHugh* v. *Santa Monica Rent Control Bd., supra,* 49 Cal.3d at p. 363 [maj. opn.]; *id.* at p. 387 [Panelli, J., conc.].) Reimbursement can reasonably be labelled a restitutive remedy, either because it awards a plaintiff "the very thing to which he was entitled" (see *Maryland Dept. of Human Resour.* v. *Dept. of H.H.S., supra,* 763 F.2d at p. 1446), or because it attempts to compensate a plaintiff for the cost of performing the duty of another (see Rest., Restitution, § 115 [providing that a person who performs the duty of another is entitled to "restitution"]).

This label does not, however, preclude characterization of the amounts in question here as "damages" awarded to compensate a plaintiff for out-of-pocket expenditures. Indeed, restitution, to which the insurers analogize the

reimbursement at issue here, is frequently denominated as one type of "damages" for descriptive purposes. (See, e.g., *McHugh* v. *Santa Monica Rent Control Bd., supra,* 49 Cal.3d at p. 363; *U.S.* v. *Conservation Chemical Co., supra,* 653 F.Supp. at pp. 192-193; Rest.2d Torts, § 903 [defining "compensatory damages" as damages awarded to person "as compensation, indemnity or restitution for a harm sustained by him"]; 5 Corbin on Contracts (1964) § 996, p. 15 [noting that "damages" is frequently used to denote "any sum of money for which a court gives judgment to an injured party," but rejects this usage for purposes of treatment of contract damages]; Dobbs, Handbook on the Law of Remedies (1973) § 4:5.) Whatever technical distinctions we and other courts have drawn between restitution and compensatory damages in other contexts, in ordinary terms both concepts are within the definition of "damages." For the purposes of interpretation, this fact is dispositive.

██ Nonetheless, because reimbursement of response costs is restitutive in that it attempts to restore to the agencies the value of a benefit constructively conferred on FMC, we consider one further argument. California courts have held that, as a matter of public policy, an insured's payment of certain types of restitution cannot be covered by insurance. (See, e.g., *State Farm Fire & Cas. Co.* v. *Superior Court* (1987) 191 Cal.App.3d 74 [236 Cal.Rptr. 216] [insurer has no duty to defend criminal prosecution of insured, because "restitution" to victims of criminal conduct is punitive remedy not coverable as "damages"]; *Jaffe* v. *Cranford Ins. Co., supra,* 168 Cal.App.3d 930 [insurer has no duty to defend insured against criminal prosecution for Medicaid fraud, despite fact that state could have sought civil reimbursement of fraudulently procured funds instead of prosecuting; such reimbursement would be "restitution," not "damages"].)

These cases are inapposite. Unlike *State Farm Fire & Cas. Co.* v. *Superior Court, supra,* 191 Cal.App.3d 74 the relief sought in the underlying suits at issue here is not punitive. CERCLA, for example, is a strict liability statute that serves essentially remedial goals, irrespective of fault. (See, e.g., *United States* v. *Northeastern Pharmaceutical, supra,* 810 F.2d at pp. 732-737, 740-741; *J. V. Peters & Co., Inc.* v. *Administrator, EPA* (6th Cir. 1985) 767 F.2d 263, 265-266; *State of N. Y.* v. *Shore Realty Corp.* (2d Cir. 1985) 759 F.2d 1032, 1043-1044.) Reimbursement of response costs, moreover, is not restitutive in the narrow sense identified by *Jaffe* as inappropriate for insurance coverage. (See *Jaffe* v. *Cranford Ins. Co., supra,* 168 Cal.App.3d at p. 935 ["Although the concept of 'restitution' may have a broader meaning in other contexts, we limit our reference to it here to situations in which the defendant is required to restore to the plaintiff that which was wrongfully acquired."]; *Aerojet, supra,* 211 Cal.App.3d at p. 231 [distinguishing *Jaffe* on this basis].) ██ ██ ██ ██ In short, we are not persuaded that the

relief at issue here is of the narrow type identified by these cases as not a proper subject of coverage by insurance.[15] We conclude that reimbursement of environmental response costs is "damages" under the terms of the insurance policies at issue here, and that public policy does not prevent coverage.[16]

### (b) *Costs of compliance with injunctions*

 The statutes on which the third party suits are based provide that, in lieu of remedying contamination and seeking reimbursement, the agencies may obtain injunctions compelling responsible parties to both cease discharging hazardous waste and clean up damage already present. (See *ante,* p. 816.) As courts and commentators have recognized, government cleanup efforts are generally considerably more expensive than cleanups performed by the responsible party. (See, e.g., *Intel, supra,* 692 F.Supp. at p. 1183; *Chemical Applications Co.* v. *Home Indemnity Co.* (D.Mass. 1977)

---

[15] In 1988, the Legislature added a new section to the Insurance Code. That section provides: "No policy of insurance shall provide, or be construed to provide, any coverage or indemnity for the payment of any fine, penalty, or restitution in any civil or criminal action or proceeding brought by the Attorney General, any district attorney, or any city prosecutor . . . ." (Ins. Code, § 533.5; see also Stats. 1988, ch. 489, § 3, No. 3 Deering's Adv. Legis. Service, p. 1725 [stating that section 533.5 "does not constitute a change in, but is declaratory of, the existing law"].) Although on its face this provision does not apply to relief sought by the *federal* government, it does apply to state and local government recovery of restitution. As such, we must determine whether it precludes coverage of the "restitutive" remedies sought in the third party suits here.

Insurance Code section 533.5 provides no definition of "fine, penalty, or restitution." Because it expressly purports to declare preexisting law (see Stats. 1988, ch. 489, § 3), we look to the law prior to 1988 to determine the breadth of its prohibitions. Our examination leads us to conclude that the section does not preclude coverage of the relief sought by the state government in the third party suits at issue here.

The Hazardous Substance Account Act, enacted in 1981 (Stats. 1981, ch. 756, § 2, p. 2935 et seq.), expressly *permits* responsible parties to enter into agreements to "insure, hold harmless, or indemnify a party to the agreement for any costs or expenditures under this chapter." (Health & Saf. Code, § 25364.) Such expenditures include reimbursement of state response costs under the act. (*Id.,* § 25360.) Even if reimbursement is "restitution," therefore, the more specific and preexisting terms of the act render Insurance Code section 533.5 inapplicable in this case. (See Code Civ. Proc., § 1859; *County of San Diego* v. *Bouchard* (1987) 195 Cal.App.3d 34, 39 [240 Cal.Rptr. 391].).

This conclusion is supported by the recent enactment of Assembly Bill No. 3334, 1989-1990 Regular Session, effective January 1, 1991, which amends Insurance Code section 533.5 to eliminate the source of this confusion, and states that the Legislature's original intent in enacting section 533.5 was "[n]ot to affect the existence, or nonexistence, of insurance coverage, or the duty to defend in actions such as, but not limited to, actions brought by any entity pursuant to Section 25360 of the Health and Safety Code . . . or any similar federal law." (Stats. 1990, ch. 1512, § 2, No. 7 Deering's Adv. Legis. Service, p. 6533.)

[16] We do, however, note that section *533* of the Insurance Code—prohibiting insurance of costs resulting from "willful" acts of the insured—would apply to cleanup costs if the requisite factual predicate (i.e., that the hazardous waste disposal necessitating cleanup was "willful") were to be proved.

425 F.Supp. 777, 778-779; Pendygraft et al., *Who Pays for Environmental Damage: Recent Developments in CERCLA Liability and Insurance Coverage Litigation* (1988) 21 Ind.L.Rev. 117, 151.) For this reason, federal and state governments generally seek voluntary and involuntary cleanup by the responsible party (pursuant to injunction if necessary) before performing it themselves and seeking reimbursement under CERCLA. (See, e.g., *Intel, supra,* 692 F.Supp. at p. 1193; Health & Saf. Code, § 25355.5, subd. (a) [prohibiting state Department of Health Services from spending state "Superfund" funds prior to determining that potentially responsible party has not complied with orders or agreements to take corrective action].) We now examine whether any or all of the costs of complying with injunctions issued under CERCLA and similar statutes are "damages" under the CGL policies.

The costs of injunctive relief, whether incurred for prophylactic, mitigative, or remedial purposes, do not readily satisfy the statutory or dictionary definitions of "damages." Because such costs are paid to employees or independent contractors rather than aggrieved parties, they do not directly "compensate" aggrieved persons for "loss" or "detriment." (See *ante,* pp. 828-830.) To be sure, in economic terms it may make little difference whether cleanup is performed and paid for directly by the insured pursuant to injunction or undertaken by the agencies (who then seek reimbursement). Nonetheless, it is difficult to construe the two methods of payment as equally covered by the ordinary definition of the word "damages," as we have described it above. If the costs of injunctive relief may be deemed "damages," the "as damages" limitation contained in the policies seems to be rendered meaningless. The costs of injunctions are essentially "sums to which the insured becomes legally obligated to pay . . . because of property damage." Construing them also to be "sums to which the insured becomes legally obligated to pay *as damages* because of property damage" makes the italicized phrase redundant. Because we are obligated to give effect to every part of an insurance policy (Civ. Code, § 1641), we hesitate to reach this result.

It is unlikely, however, that the parties to CGL policies intended to cover reimbursement of response costs but not the costs of injunctive relief, at least where the latter costs are incurred—generally at a lower total cost—for exactly the same purposes addressed through governmental expenditure of response costs. In this respect, we note that the relationship between the remedies authorized by CERCLA and similar statutes is not the same as that between damages and injunctive remedies traditionally available at common law and in equity. In ordinary tort actions, injunctive relief is generally available only if legal remedies (e.g., monetary compensation) are inadequate. (Code Civ. Proc., § 526; Civ. Code, § 3422; see generally 6

Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 276, p. 576, and cases cited therein.) Thus, a plaintiff ordinarily may seek to enjoin conduct that constitutes a nuisance, even though the activity complained of does not cause him any cognizable property or personal damage. In such a situation, the defendant's costs of complying with an injunction might not be covered by CGL policies. (See, e.g., *Hanna, supra,* 224 F.2d 499; *Desrochers* v. *New York Casualty Co., supra,* 106 A.2d 196; *Garden Sanctuary, Inc.* v. *Insurance Co. of No. Amer., supra,* 292 So.2d 75; *Ladd Const. Co.* v. *Ins. Co. of North America* (1979) 73 Ill.App.3d 43 [391 N.E.2d 568].)

In *Hanna, supra,* 224 F.2d 499, the leading case holding that the cost of complying with mandatory injunctions in tort actions is not "damages" under CGL policies, adjoining property owners brought suit against the insured, alleging trespass by boulders and debris from the insured's property. The owners sought no damages (and there was no evidence that the value of their property had decreased as a result of the encroachment). Instead, they sought, and obtained, an injunction ordering the insured to remove the debris. The Fifth Circuit Court of Appeals held the costs of complying with the injunction not covered under the insured's liability policy, which contained substantially the same coverage clause as those at issue here. Its reasoning, however, focused on the fact that, under Florida law, the owners' potential damages remedy was limited to the diminution in value of their property; injunctive relief, by contrast, required monetary payment whether or not the value of the owners' property had decreased. Because there was no evidence of any decrease in property value, the court reasoned, the costs of complying with the injunction were not "damages." (*Hanna, supra,* 224 F.2d at p. 503.)

We need not here decide whether the reasoning of *Hanna* is persuasive as a matter of California law.[17] Unlike Florida, California does not, as is noted above, absolutely limit damages for trespass to the diminution in value of the plaintiff's property. (See *ante,* p. 834.) Moreover, the basic foundation of the *Hanna* decision—the interplay of legal and equitable remedies in tort actions in which it is entirely speculative whether the plaintiff has suffered

---

[17] In this respect, we agree with the court in *Aerojet, supra,* 211 Cal.App.3d at page 234, that *Hanna, supra,* 224 F.2d 499, is distinguishable from CERCLA cases. We note, however, that the approach taken in *Aerojet* to resolve the issue presented here may have unintended consequences in distinguishable cases. Because *Aerojet* applies an extremely broad definition of "damages" (i.e., "any economic outlay compelled by law to rectify and mitigate property damage caused by the insured's pollution"), it implicitly suggests that the costs of mandatory injunctive relief *in all contexts,* common law as well as statutory, may be covered by CGL policies. (211 Cal.App.3d at p. 228.) We find that a more debatable proposition than the limited one—based on the peculiar juxtaposition of injunctive and reimbursement remedies in CERCLA—we endorse here. The precise issue presented in *Hanna* remains unresolved as a matter of California law.

compensable harm—differs from the relationship between the various remedies authorized by CERCLA, under which injunctive relief may be available even though legal or restitutive remedies are adequate. (See, e.g., *United States* v. *Waste Industries* (4th Cir. 1984) 734 F.2d 159, 168 [injunction available under RCRA even if reimbursement under CERCLA would be adequate remedy]; *United States* v. *Conservation Chemical Co.* (W.D.Mo. 1985) 619 F.Supp. 162, 212-213 [injunction under CERCLA, 42 U.S.C. § 9606, not absolutely barred by availability of reimbursement under 42 U.S.C. § 9607(a)].)

The mere fact that the agencies seek an injunction in an environmental protection action does not indicate an absence of cognizable property damage or personal injury. The prima facie case for injunctive relief is identical to that for reimbursement of response costs, with the single added element of "imminent and substantial endangerment" of public health or welfare or the environment. (See, e.g., *United States* v. *Bliss* (E.D.Mo. 1987) 667 F.Supp. 1298, 1313.) Moreover, in its remedial aspects, the injunction results in exactly the type of expenditures involved in reimbursement of response costs, whether or not the agencies have an adequate remedy in the form of reimbursement. (See, e.g., *United States* v. *Price* (D.N.J. 1983) 577 F.Supp. 1103, 1112 [Congress intended injunctive relief under 42 U.S.C. § 9606 to be "a viable alternative or concurrent means of achieving the same goal" as reimbursement under 42 U.S.C. § 9607].)

For these reasons, it would exalt form over substance to interpret CGL policies to cover one remedy but not the other. Given the practical similarity of remedies available under the environmental statutes at issue here, we believe a reasonable insured would expect both remedies to fall within coverage as "damages." Insofar as injunctive relief is an equivalent substitute for the goal of government remedial action, the distinction relied on by *Hanna, supra,* 224 F.2d 499, is inapposite in the CERCLA context.

A majority of courts have also reached this conclusion. Some have reasoned that such costs are "damages" according to the reasonable expectations of the parties, even if they would not be "damages" under technical definitions. (See, e.g., *C.D. Spangler Construction Co.* v. *Industrial Crankshaft & Engineering Co., Inc., supra,* 388 S.E.2d 557, 565; *Aerojet, supra,* 211 Cal.App.3d at p. 228; *Chesapeake Utilities Corp.* v. *American Home Assur., supra,* 704 F.Supp. at pp. 559-560.) Others have stated this conclusion in terms of public policy: costs of compliance must be interpreted as "damages" in the environmental context, because to hold otherwise would make insurance coverage hinge on the "mere fortuity" of the way in which government agencies seek to enforce cleanup requirements, would unreasonably constrain the agencies' choice of cleanup mechanisms, and would

introduce substantial inefficiency into the cleanup process. (See, e.g., *C.D. Spangler Construction Co., supra,* 388 S.E.2d 557, 566; *Intel, supra,* 692 F.Supp. at pp. 1183, 1193; *Chemical Applications Co.* v. *Home Indemnity Co., supra,* 425 F.Supp. at pp. 778-779; *United States Aviex Co.* v. *Travelers Ins. Co., supra,* 336 N.W.2d at p. 843.)

We agree with the underlying rationale of these decisions. Under CERCLA and similar statutes, injunctive relief and reimbursement of response costs serve substantially the same purpose. For this reason, we find CGL policy language is ambiguous as applied to remedial and mitigative costs incurred pursuant to injunction under CERCLA and similar statutes, and therefore must be construed in favor of coverage to satisfy the reasonable expectations of the insured. (See *ante,* p. 822.)

In contrast to our determination, two federal Courts of Appeals have concluded that the costs of injunctive relief under CERCLA and similar statutes are not covered by CGL policies. (See *NEPACCO, supra,* 842 F.2d at p. 986; *Armco, supra,* 822 F.2d at p. 1353.) One of these decisions essentially relies on an uncritical adoption of the *Hanna* result (*supra,* 224 F.2d 499). (*NEPACCO, supra,* 842 F.2d at p. 986 [stating that "black letter insurance law holds that claims for equitable relief are not claims for 'damages' under liability insurance contracts," while citing four cases supporting the proposition and three challenging it in the environmental context].) The other decision supports its conclusion by referring to the "prophylactic," and therefore uninsurable, nature of injunctive relief. (See, e.g., *Armco, supra,* 822 F.2d at p. 1353.) Because the reasoning of the *Hanna* court is not compelling in the CERCLA context, and because it is incorrect to portray injunctive relief under CERCLA and related statutes as wholly prophylactic in nature, we decline to follow these decisions.[18]

It is true that some costs required under environmental injunctions are prophylactic in nature (e.g., altering dumping practices to prevent recurrences of leakage). As we discuss below, these costs are not incurred "because of property damage," and therefore are not covered by CGL policies. Nevertheless, environmental injunctions requiring remedial and mitigative action result in costs that constitute "damages" under CGL policies. Because an insured would reasonably expect equal coverage of the costs of

---

[18] We again note that the additional justification offered by these decisions for their result— the fact that coverage of the costs of injunctive relief would render the "as damages" clause of CGL policies meaningless—possesses some merit. (See *ante,* pp. 837-838.) For the reasons stated above, however, it is our view that "damages" is ambiguous in the CERCLA context and therefore should be construed in favor of coverage and in accordance with the objectively reasonable expectations of the insured, regardless of any formal or technical difficulties this reading poses.

equivalent or alternative remedies, the costs of injunctive relief under the statutes in question here are "damages" for CGL purposes.[19]

### 3. *"Because of Property Damage"*

■ Several courts have held that government claims for injunctive relief and reimbursement of costs incurred in cleaning up disposal sites and water surrounding them are not covered by CGL policies, because such claims do not allege "property damage." (See, e.g., *Armco, supra,* 822 F.2d at pp. 1353-1354; *Mraz* v. *Canadian Universal Ins. Co., Ltd., supra,* 804 F.2d at pp. 1327-1329.) We disagree. As we note above, these decisions either misperceive the basic character of remedies available under environmental statutes or apply an unduly narrow definition of "property damage." (See *ante,* pp. 832-833.) CGL policies cover sums expended as damages not only because of "harm to human or animal life" (*Armco, supra,* 822 F.2d at p. 1354), but more generally because of "property" damage. Contamination of the environment satisfies this requirement. (Cf. *Aerojet, supra,* 211 Cal.App.3d at pp. 229-230; *NEPACCO, supra,* 842 F.2d at p. 983; *Port of Portland* v. *Water Quality Ins. Syndicate* (9th Cir. 1986) 796 F.2d 1188, 1193-1194; *Chesapeake Utilities Corp.* v. *American Home Assur., supra,* 704 F.Supp. at p. 566; *Intel, supra,* 692 F.Supp. at pp. 1183, 1185; *New Castle County* v. *Hartford Accident & Indem. Co., supra,* 673 F.Supp. at p. 1366; *U.S.* v. *Conservation Chemical Co., supra,* 653 F.Supp. at p. 193; *Boeing, supra,* 784 P.2d at p. 516; *Compass Ins. Co.* v. *Cravens, Dargan & Co., supra,* 748 P.2d at p. 728; *Specialty Coatings, supra,* 535 N.E.2d at pp. 1081-1082.)

We also hold that reimbursement of response costs and the costs of injunctive relief under CERCLA and related statutes are incurred "because of" property damage. As discussed above (see *ante,* pp. 828-829), the mere fact that the governments may seek reimbursement of response costs or injunctive relief without themselves having suffered any tangible harm to a proprietary interest does not exclude the recovery of cleanup costs from coverage under the "damages" provision of CGL policies. For similar reasons, in plain and ordinary terms such recovery is "because of" property damage. It is immaterial whether motivations other than protection of

---

[19] Our conclusion—that the costs of injunctive relief as well as reimbursement of government response costs constitute "damages"—applies equally to the policies covering "ultimate net loss." As defined by the policies, "ultimate net loss" includes "the *total sum* which [FMC] . . . becomes obligated to pay by reason of . . . property damage," including "expenses" as well as "damages." (Italics added.) The plain meaning of this definition encompasses reimbursement of response costs and the costs of compliance with injunctions ordering FMC to clean up hazardous waste. For this reason, such costs are "ultimate net loss" within the meaning of these policies, as we are compelled to interpret them. (Civ. Code, § 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."].)

property—for example, protection of the health of persons living near hazardous waste sites—also contribute to the agencies' pursuit of statutory relief. The Court of Appeal's emphasis on the fact that the agencies' objectives may be regulatory rather than proprietary is misplaced. Whatever their dominant motive, the event precipitating their legal action is contamination of property. The costs that result from such action are therefore incurred "because of" property damage. (See, e.g., *Aerojet, supra,* 211 Cal.App.3d at p. 236; *Boeing, supra,* 784 P.2d at p. 516.)

This is true, moreover, whether the cleanup at issue in the underlying suits takes place on property owned by FMC, the state or federal government, or third parties. The provisions at issue here do not specify that coverage hinges on the nature or location of property damage. We therefore construe them to encompass damages because of property damage in general, regardless of by whom it is suffered.

We do agree that prophylactic costs—incurred to pay for measures taken in advance of any release of hazardous waste—are not incurred "because of property damage." (Cf. *Aerojet, supra,* 211 Cal.App.3d at p. 236; *Boeing, supra,* 784 P.2d at p. 516; *CPS Chem. Co., Inc.* v. *Continental Ins. Co., supra,* 536 A.2d at p. 317.) Until such damage has occurred, whether on the waste site itself or elsewhere, there can be no coverage under CGL policies. Beyond this limited circumstance, however, and because the agencies in this suit allege that the waste sites themselves and the water on and surrounding the sites have already been contaminated by hazardous waste, we conclude that the reimbursement and the costs of injunctive relief sought here at least in part constitute "damages because of property damage."

### III. CONCLUSION

For the foregoing reasons, we conclude that the Court of Appeal erred in directing the superior court to enter summary adjudication in favor of the insurers. It is not clear, as a matter of law, that all of the relief for which FMC is potentially liable in the underlying suits cannot be deemed sums which it will be "legally obligated to pay as damages because of property damage." Although the costs of compliance with injunctions ordering FMC to undertake prophylactic measures are not covered by CGL policies covering payment of damages "because of property damage," the remaining remedies sought by the agencies in the underlying suits are not precluded from coverage as a matter of law; such relief satisfies the plain and ordinary meanings of the phrases "legally obligated," "damages," "ultimate net loss," and "because of property damage." Accordingly, we reverse the decision of the Court of Appeal and vacate its order issuing a writ of

mandate, and direct the Court of Appeal to remand this case to the superior court for further proceedings consistent with this opinion.

Mosk, J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.