No. 32,126

F. L. HAGAMAN, as Administrator of the Estate of George Miller, Deceased, *Appellant,* v. F. L. MANLEY and JOHN LOWEN, *Appellees.*

(42 P. 2d 946)

Opinion filed April 6, 1935.

*Joseph Cohen* and *Norman B. Sorter,* both of Kansas City, for the appellant.
*James F. Getty,* of Kansas City, for the appellees.

The opinion of the court was delivered by

BURCH, J.: After a shifting of plaintiffs and beneficiaries, the action in the district court became one by F. L. Hagaman, as administrator of the estate of George Miller, deceased, to recover damages for Miller's death. Death was caused by collision between two motor trucks. One was owned by John Manley, doing business as the Manley Transfer Company. At the time of the accident this truck was operated by John Lowen. Miller was riding in the other truck. Manley and Lowen were made defendants.

The action was originally commenced by Janie Miller, as administratrix of George Miller's estate. Janie claimed she had been Miller's common-law wife. As such, the probate court had appointed her as administratrix. Then a technical impediment to effective exercise of Janie's rights as widow and administratrix was discovered. She had a regular husband, Sam Moore, from whom she had not been divorced.

Many years before Miller's death, Moore had sued Janie for divorce, but the action had been dismissed for want of prosecution. In 1919, assuming Moore had procured a divorce, Janie openly and notoriously took up with Miller as his common-law wife, and for some eleven years they shucked their shoes together in many places, from Ardmore, Okla., to Butte, Mont. Finally they came back to Kansas City.

One day in June, 1930, Miller met an eighteen-year-old girl, who was on her way to the drug store. The result was, that soon afterward they commenced to common law together. Her name was Helen. Helen contested Janie's claim that Janie was Miller's common-law widow, and entitled to be administratrix. To protect her interest, Janie sort of quieted her title. She went into district court, had the dismissal of Moore's old divorce action set aside, had the record "corrected," and procured a *nunc pro tunc* decree of divorce to be entered against herself and in favor of Sam Moore. The result of this solemn judicial pronouncement in furtherance of justice and Janie's damage suit was that Miller died leaving, so far as known, at least two common-law widows. That muddled the damage suit. Perhaps under the law that the first shall be last (Matthew XX, XVI) the probate court removed Janie as administratrix, but in furtherance of justice and the damage suit, the probate court fixed up matters in this way: Janie had one lawyer and Helen had another. Helen waived privilege to be appointed administratrix, her lawyer was appointed administrator, and Janie's lawyer was retained as attorney for Helen's lawyer. By leave of court, Helen's lawyer, as administrator, was substituted for Janie as plaintiff in the damage suit.

Janie's suit as administratrix had been for her benefit as common-law widow. The petition was amended to show that the administrator's suit was for the benefit of Helen as common-law widow. The attorney for defendants made trouble over the shift of beneficiaries, and finally the petition was amended to make it read that the damage suit was for the benefit of Helen or Janie, as interest might appear.

The damage suit was for $10,000, a good round sum, and the attorney for defendants insisted that since there is no flat rate for common-law widows, interest in fact ought to be determined.

At the time of his death, Miller was working for the government and was earning $3.20 per day for one day in the week. The day he was killed he was going fishing. The damage suit for Helen's benefit was for deprivation of support, maintenance, companionship and consortium, which must have been chiefly for companionship and consortium. She was with him on the fishing trip.

Janie testified that before Miller took up with Helen, he had lived with a woman named Anna, and had lived with a woman named Luella, and Janie just lost confidence in him. Janie said that while

Miller was living with Helen, he would visit Janie, but he hadn't supported her much, would give her fifty cents or twenty-five cents, whatever he had.

The verdict was in favor of plaintiff for $3,000, for somebody's benefit.

The accident which resulted in Miller's death occurred just south of the south entrance to a bridge over Turkey creek on highway 10, between Merriam and Kansas City. The highway extends in a northerly and southerly direction from the bridge. The bridge is sixty-six feet, five inches long. The roadway on the bridge is eighteen feet wide, but at each end of the bridge the roadway is narrowed twenty-eight inches.

Cornelius Robinson had converted a Buick touring car into a half-ton truck by putting a box bed on the rear end. Back of the driver's seat were two benches or seats, constructed of boards put across the bed. On the day of the accident, Robinson, Miller, and several ladies started from Miller's house on a fishing trip, in the Buick truck. Robinson drove the truck. Miller sat on the first board seat and behind the driver. As they approached the bridge, Miller's left leg was hanging outside the truck bed.

As the Buick truck approached the bridge from the north, a Cadillac car approached the bridge from the south. The Cadillac was owned by Paul J. Byrne. Byrne had been to Merriam to inspect his lumber yard there and was returning to Kansas City. His car was operated by a chauffeur.

Behind the Cadillac car was a freight transfer truck owned by defendant Manley and driven by defendant Lowen. The freight truck had a body eight feet wide, twelve and one-half feet long and ten and one-half feet high, and was loaded with two and one-half tons of eggs.

Byrne testified for defendants as follows:

"As we got to the bridge, we saw a car coming from the north very fast and we were dubious about crossing the bridge with this car coming at us so fast, so we stopped. We stopped right at the south entrance to the bridge."

Lowen testified for defendants as follows:

"When I got near to the south end of the bridge, a car ahead of me, when it got onto the south end of the bridge, stopped suddenly. I was about sixty or seventy feet behind this car. I pulled my truck to see if there was anything that would hinder me from trying to cut across, because I did not think that I could get by without hitting Mr. Byrne's car, or the car that was ahead of

me, and I saw that there was, saw this car coming through the bridge and I swerved back into right position, taking a chance of hitting Mr. Byrne's car, which I did not do. . . . The car that was coming toward us was running fast and that is why I pulled back in as quick as I could. When I noticed it, it was just getting ready to approach the bridge."

Robinson testified for plaintiff that as he came across the bridge he was going about twenty miles per hour, and testified further as follows:

"As we approached the bridge that spans Turkey creek near Merriam, Kan., I observed two vehicles approaching from the opposite direction. I do not know what the first car was but the second was a Chevrolet truck. The first car was a pleasure car driven by a white man. The truck was right behind this pleasure car. I was driving on the right side of the road, going south. We were about a foot and a half to the right of the center line of the highway and continued that far from the center line when we were just about across the bridge. As we were about to leave the bridge the pleasure car was about a car's length from the bridge. The truck was so close to the pleasure car that he just could not stop and he just come out from behind it. When I saw him come from behind the pleasure car, I put on my brakes and turned to the right. The truck did not stop, but kept on coming. It did check its speed. I cut to the right in order to keep from hitting face to face and when I cut to the right he just kept coming and then I got a jar. . . . The corner of the bed of that truck struck my truck about middleways of the bed and right where George Miller was sitting. It tore the fender off of my truck and broke the bed right at the point where George Miller was sitting."

Other witnesses for plaintiff gave their versions of the incidents of the accident. The corner of the transfer truck struck Miller's leg hanging outside the Buick truck, crushed the leg, and soon afterward Miller died.

The instructions to the jury covered the subjects of negligence, conduct in an emergency, contributory negligence and "proximate" cause, and no complaint is made of the instructions by either plaintiff or the defendants.

With the general verdict for plaintiff, the jury returned the following findings of fact:

"1. Did Janie Miller, formerly Janie Moore, ever enter into an agreement with George Miller to become his common-law wife, and, if so, on or about what date? A. Yes, about June, 1919.

"2. If you find they entered into an agreement to marry, state whether they lived together as husband and wife pursuant to and in fulfillment of that agreement. A. We do.

"3. Did Helen Miller, formerly Helen Francis, ever enter into an agreement with George Miller to become his common-law wife, and, if so, on or about what date? A. Yes, on or about June, 1930.

"4. If you find they entered into an agreement to marry, state whether they lived together as husband and wife pursuant to and in fulfillment of that agreement. A. Yes, they lived together for said two and one-half years.

"5. Was the proximate cause of this accident, as defined by the court in its instructions, the excessive speed at which the said Buick car was running at the time of said accident? A. Was not.

"6. Was the proximate cause of this accident, as defined by the court's instructions, the carelessness and negligence of the driver of the Buick car? A. Was not.

"7. Was the deceased riding with his leg extending outside of the body of the car at the time of the accident in question? A. Yes.

"8. If you answer the foregoing question in the affirmative, was that the proximate cause of the injury of the deceased which resulted in his death? A. Yes.

"9. After the danger of the situation became apparent to the driver of the defendant's truck, did he use ordinary care and prudence to prevent an accident, in view of conditions at the time and the short length of time he had available to think and make a decision? A. Yes.

"10. If you find that the defendants were guilty of any carelessness and negligence which caused the accident in question, state specifically of just what that carelessness and negligence consisted. A. For driving from his lane of traffic."

"12. Was the defendant's truck standing still or moving at the time of the accident in question? A. Moving."

Plaintiff moved to set aside the answer to question 8 and the motion was denied. Defendants moved for judgment in their favor, notwithstanding the general verdict, and the motion was allowed. Plaintiff appeals, and assigns as error the two rulings just referred to.

The district court filed a written opinion in which the court interpreted finding 8 as a finding that Miller was guilty of contributory negligence, without which his injury and death would not have occurred. This court is inclined to agree with the district court, but the subject may be left at one side. The district court also based its judgment on the fact the evidence did not establish actionable negligence on the part of the driver of the transfer truck, although the jury found he was negligent in driving from his lane of traffic. In discussing that subject the district court said:

"The testimony is practically undisputed that the driver of the northbound Cadillac car was apprehensive of danger from the approaching Buick truck and suddenly stopped his car in front of the defendants' truck, which was following . . ."

In another part of the opinion the district court said:

"The evidence stands uncontradicted that the driver of the Cadillac car stopped suddenly in front of defendants' truck and that the defendants' driver

was confronted with a situation which called for quick action in order to prevent a collision; that in attempting to avoid the collision he turned his truck to the left . . ."

Plaintiff challenges the district court's conclusion on two grounds: first, that the Cadillac did not stop suddenly, and second, that the driver of the transfer truck himself created the emergency in respect to which he subsequently acted prudently.

There are differences in the testimony of the various witnesses with respect to just what occurred. Thus, there was testimony the Cadillac did not stop. Robinson said the Cadillac did not stop. This testimony really meant no more than that the Cadillac had not stopped when the last observation was made, and carefully analyzed, there was no substantial testimony which would authorize the jury to say the Cadillac did not stop. Byrne said his car slowed down, something which Robinson saw, and stopped, something which Robinson did not observe. Lowen said the Cadillac stopped. There was no rebuttal after Byrne and Lowen testified the Cadillac stopped, and in this appeal plaintiff does not contest the fact that the Cadillac stopped. As indicated, plaintiff does dispute that the Cadillac stopped suddenly, and so created the emergency which confronted Lowen.

Lowen said the Cadillac stopped suddenly. Byrne said his car did not stop suddenly, it "just slowed up and came to a standstill"; "apparently we just slowed up and stopped."

As indicated above, Byrne testified that as he "got to the bridge" he saw the Buick truck coming at a rapid rate of speed. He was dubious about crossing the bridge, "so we stopped. We stopped right at the south entrance to the bridge."

Byrne testified as follows:

"Q. What rate of speed were you going as you approached the bridge? A. Oh, I think approximately fifteen miles an hour, maybe twenty. I don't think over fifteen."

If his car was moving at a rate of twenty miles per hour, it was moving twenty-nine feet per second. If the car was moving at a rate of fifteen miles per hour, it was moving twenty-two feet per second. Whatever the distance from the point at which Byrne "got to the bridge" and the "south entrance to the bridge," the Cadillac was not long in stopping.

Lowen said the stop light on the back of the Cadillac gave him a signal. The primary meaning of the word "sudden" is, "happening

without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for"; (Webster's New International Dictionary, Second Edition). While to Byrne his car doubtless stopped smoothly and without shock, to Lowen it necessarily stopped suddenly.

Lowen testified that after leaving Merriam he attained a speed of perhaps thirty miles per hour and gained on the Cadillac. He thought the Cadillac was traveling at about the same rate of speed, but he did not dispute Byrne's estimate of the rate at which the Cadillac was moving. Lowen said he was within sixty or seventy feet of the Cadillac, and could stop within seventy-five feet. Helen Miller, a witness for plaintiff, said the transfer truck was right behind the Cadillac. Robinson, a witness for plaintiff, said the transfer truck was right behind the Cadillac and was so close to the Cadillac the driver just could not stop and just came out from behind the Cadillac. The result is, the testimony was conclusive that the action of the Cadillac created grave danger of collision between it and the transfer truck.

In response to request for specific statement of in just what Lowen's negligence consisted, the jury made specific answer—driving from his lane of traffic. He was not driving too fast; he was not driving too close to the Cadillac; he was not inattentive to his driving; he was not slow of apprehension; he was not unskillful; and he did not lack control of the truck. The finding of the jury acquitted him of all negligence, except that he drove from his lane of traffic, and he did not do that until the Cadillac created the situation which was fraught with peril. The jury approved Lowen's subsequent conduct.

The result of the foregoing is, the court properly rendered judgment for defendants, notwithstanding the general verdict in favor of plaintiff. This being true, propriety of the court's refusal to strike out finding 8 relating to proximate cause need not be discussed. The social problem presented by the record must also remain unsolved.

The judgment of the district court is affirmed.