**MAPCO ALASKA PETROLEUM, INC., Plaintiff,**

v.

**The CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, et al., Defendants.**

**No. A89–470 Civil.**

United States District Court, D. Alaska.

Nov. 15, 1991.

Matt Murray, Murray, Dunham & Murray, Seattle, Wash., Frank S. Koziol, Jr., Law Offices of Frank S. Koziol, Jr., Anchorage, Alaska, for U.S. Fidelity & Guar. Co.

H. Douglas Galt, O'Melveny & Myers, Los Angeles, Cal., J.W. Sedwick, Burr, Pease & Kurtz, Anchorage, Alaska, for Pacific Employers Ins. Co.

Lou Lustenberger, Jr., George R. Hinckley, Jr., Donovan, Leisure, Newton & Irvine, New York City, Lin Peterson, General Counsel, MAPCO Alaska Petroleum, Inc., Tulsa, Okl., Michael R. Spaan, Bogle & Gates, Anchorage, Alaska, for plaintiff.

## ORDER

(Re Motions for Summary Judgment)

MATTHEW D. JAMIN, United States Magistrate Judge.

The court has before it several motions for summary judgment which require the court to interpret provisions contained in insurance policies issued to plaintiff MAPCO Alaska Petroleum, Inc. ("MAPI").[1] The defendant insurance companies are: Central National Insurance Company of Omaha and Protective National Insurance Company of Omaha (collectively "Central"), Pacific Employers Insurance Company ("PEIC"), and United States Fidelity & Guaranty Company ("USF & G"). Oral argument was heard on September 6, 1991.

## FACTUAL BACKGROUND

MAPI operates a refinery ("NPR") at North Pole, Alaska. NPR began operating in August of 1977. NPR refines North Slope crude oil which is delivered through a pipeline connected to the Trans–Alaska Pipeline System. The refined product is

---

1. MAPI is a subsidiary of MAPCO, Inc. It was previously known as Earth Resources Company until purchased by MAPCO in 1980.

loaded into trucks and railroad cars for transportation overland.

From the first day of operation, NPR has experienced small product spills. The spills were cleaned up by washing the spill product into underground concrete sumps and by using absorbent pads. This system was considered an innovative environmental protection system. However, even before the refinery began operation, there were problems with parts of the system due to the presence of "active" soils. Active soils are susceptible to the effects of freezing and thawing.

In addition to problems with the sumps, above-ground storage tanks leaked or sweated their contents, JP–4 or kerosene. These tanks were purchased used from the military shortly after the refinery began operation and were taken out of service in 1982. Even though a dike-lined area surrounded the tanks, the Alaska Department of Environmental Conservation ("ADEC") believes the tanks are an additional source of groundwater contamination.

The product spills were routinely reported to the ADEC. Cleanup of the product spills were reviewed by the ADEC. When questioned at his deposition regarding several specific spill reports, John Janssen, the chief ADEC field officer assigned to the NPR, testified that he found the cleanup actions to be adequate for that period of time.[2] Janssen testified that, although he now knows that spilled product migrated into the groundwater sometime between 1977 and 1980, he was not aware of the migration at the time.[3]

In late 1986 and early 1987 tests showed that the groundwater beneath NPR was contaminated with benzene. At that time, MAPI entered into a "Compliance Order by Consent" with the ADEC. The consent order obligates MAPI to test the groundwater and to clean up the petroleum products in the ground as well as the benzene in the groundwater beneath the NPR. MAPI was not fined by the ADEC for contamination of the groundwater.

For reasons that are not clear to the court, MAPI did not seek indemnification from its insurers for the cleanup costs until 1989. At that time, MAPI's claims were denied and this lawsuit was initiated.

## STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c), Federal Rules of Civil Procedure, a party to a lawsuit may move for summary judgment if that party can show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. The moving party has the burden of establishing that there exists no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). For purposes of summary judgment, a material fact dispute is considered "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## CHOICE OF LAW

The court has jurisdiction over the parties in this case based on diversity of citizenship. In a diversity action, a federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F.2d 1400, 1402 (9th Cir.1990). Thus, the court must apply Alaska choice of law rules in determining which state substantive law applies in this case. The Alaska Supreme Court has looked to the principles of the *Restatement (Second) of Conflicts* (hereinafter *"Restatement"*) in resolving choice of law questions. *Alaska Airlines*, 902 F.2d at 1402 (citations omitted).

There is no choice of law provision in the parties' insurance policies. However, since insurance policies are contracts, Section 188 of the *Restatement* is helpful. Section 188 focuses on which state has the most

---

**2.** Deposition of John Herman Janssen.

**3.** *Id.* at 64.

significant relationship to the transaction and the parties. While the place of contracting, of negotiating the contract, and place of performance are factors to be considered, Section 188 also says that the location of the subject matter of the contract must be taken into account. *Restatement* § 188(2)(d).

Also helpful is Section 193 of the *Restatement* which indicates that when casualty insurance contracts are at issue, the law of the state where the insured risk was located is to be applied. In both of the above-discussed sections, the location of the insured risk is a critical factor and points to the application of Alaska law.

Defendants argue that all parties are foreign corporations and that the place of contracting was Texas or Oklahoma. They argue that Alaska has little interest in the outcome of this transaction since it is not a matter of whether the environmental damage will be remedied, but who will pay for it. This argument is unpersuasive.

Interpretation of insurance contract provisions pertaining to an insured risk located in this state are of significant importance to the State of Alaska. This is especially true when the insurance contract involves coverage for environmental damage. Alaska has a significant interest in determining who will pay for the cleanup of environmental damage since it is directly relevant to whether remediation is accomplished and to what degree. Alaska law will be applied.

### ALASKA INSURANCE LAW

Several general provisions of relevant insurance law as determined by the Alaska Supreme Court are as follows. The construction of an insurance contract is a matter for the court, unless its interpretation is dependent on resolution of controverted facts. *Whispering Creek v. Alaska Nat'l Ins. Co.*, 774 P.2d 176, 177 (Alaska 1989), *quoting O'Neill Investigations, Inc. v. Illinois Employers Ins. of Wausau*, 636 P.2d 1170, 1173 (Alaska 1981). "The general rule is that insurance contracts are construed liberally against the insurer and doubtful language is resolved in favor of the insured." *Allstate Ins. Co. v. Roelfs*, 698 F.Supp. 815, 817 (D.Alaska 1987), *citing Starry v. Horace Mann Ins. Co.*, 649 P.2d 937, 939 (Alaska 1982). "Ambiguities are resolved against the insurer." *Starry*, 649 P.2d at 939 (citation omitted). An ambiguity exists when the contract as a whole and the extrinsic evidence support different reasonable interpretations. *Allstate Ins. Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir.1985), *citing Stordahl v. Government Employees Ins. Co.*, 564 P.2d 63 (Alaska 1977).

■ "[L]anguage in an insurance policy should be interpreted as understood by reasonable laypersons and not according to the interpretation of sophisticated underwriters."[4] *O'Neill Investigations*, 636 P.2d at 1175; *Ellison*, 757 F.2d at 1044 (Terms of an insurance policy should be interpreted in their ordinary and popular sense.). "This standard is an objective standard based on the expectations of a hypothetical layperson." *Roelfs*, 698 F.Supp. at 818, *citing Deland v. Old Republic Life Ins. Co.*, 758 F.2d 1331, 1335 (9th Cir.1985).

### DISCUSSION

#### A.

*The "Watercourse or Body of Water" Exclusion*

■ PEIC has denied coverage based on the exclusionary language found in the "Oil Industry Limitation Endorsement".

---

4. MAPI can hardly be considered an average layperson. However, the foundation for the rule which favors coverage is the lack of equal bargaining power. The critical factor in distinguishing equal bargaining power between an insurance company and the insured is the ability of the insured to participate in the drafting of the terms, language, and/or options in the policy. *Clemco Industries v. Commercial Union Ins. Co.*, 665 F.Supp. 816, 819 (N.D.Cal.1987), *aff'd* 848 F.2d 1242 (9th Cir.1988); *see also AIU Ins. Co. v. FMC Corp.*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990). The policies in the present case were all standard "CGL" (comprehensive general liability) or excess liability policies. There is no evidence that MAPI participated in the drafting of the policies.

This endorsement excludes coverage for damage caused by the discharge of pollutants into "any watercourse or body of water". While the court is not at all convinced that the "Oil Industry Limitation Endorsement" applies to refinery operations such as the NPR, similar exclusionary language appears in the body of the PEIC policy.[5] Thus, regardless of whether the "Oil Industry Limitation Endorsement" applies, the court must determine whether the definition of "any watercourse of body of water" includes the groundwater. The court finds that it does.

PEIC correctly argues that Alaska law requires the terms of an insurance policy to be interpreted in an ordinary and popular sense as would a man of average intelligence and experience. *Ellison*, 757 F.2d at 1044. According to PEIC, in the ordinary and popular sense "watercourse or body of water" includes the groundwater.[6]

PEIC relies heavily on *Time Oil Co. v. CIGNA Property & Cas. Ins. Co.*, 743 F.Supp. 1400 (W.D.Wash.1990). *Time Oil* addressed an almost identical issue. In *Time Oil*, an aquifer located beneath an oil recycling facility was contaminated. There, too, the oil recycling plant had entered into a consent order to clean up contaminated groundwater. The plant sought to recover the costs of the cleanup from one of its carriers, Central National.[7] Central National denied coverage based on a provision in the policy that excluded cleanup of any watercourse, body of water, bog, marsh, or wetland.

The court in *Time Oil* looked to the ordinary meaning of the words "water-course, body of water, bog, marsh or wetland". *Time Oil*, 743 F.Supp. at 1411. The court held that the policy language clearly reflected an intent to exclude cleanup any and all water, including the groundwater. *Id.*

Groundwater is a watercourse or body of water, and to find otherwise would require the court to twist the ordinary meaning of words. Just as in *Time Oil*, the term "watercourse" can reasonably be interpreted by a layperson to include the groundwater.

PEIC's motion for summary judgment on this narrow issue is granted. However, that solves only part of the problem. The more difficult issue is whether the release of benzene into the groundwater was "sudden and accidental". That issue is discussed next.

B.

*The Qualified Pollution Exclusion*

■ Just as in the PEIC policy discussed above, the Central and USF & G policies also include language which excludes coverage for pollution of a watercourse or body of water unless the release of pollutant was "sudden and accidental". This clause is often referred to as the "pollution exclusion clause" or "qualified pollution exclusion clause". This clause [8] provides:

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemical, liquids or gases, waste materials or other

---

**5.** The exclusionary language appears on page 3 of the PEIC policy under "EXCLUSIONS" at (i) and reads:

> [This policy does not apply] to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water-course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

**6.** Groundwater is defined as "water within the earth that supplies wells and springs; water in

the zone of saturation where all openings in rocks and soil are filled, the upper surface of which forms the water table." *Webster's Third New International Dictionary* 1004 (1981).

**7.** Central National is also a defendant in this case.

**8.** *See* Affidavit of Carl Paxton in Support of Plaintiff's Motion for Summary Judgment (Clerk's Docket No. 283); Exhibit "B" (Central National Policy) at 6; Exhibit "C" (Protective National Policy) at 12 & 24; Exhibit "H" (PEIC Policy) at 2 & 9; and Exhibit "I" (USF & G Policy) at 7.

irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental.*

(Emphasis added.)

MAPI argues that "sudden and accidental" is an ambiguous exclusion, and as such must be construed in MAPI's favor. MAPI argues that the weight of authority has found that "sudden" does not have a temporal meaning. MAPI points to definitions of "sudden" that focus on the "unexpected" or "unforeseen" aspect of the word.[9]

Defendants argue that the terms "sudden and accidental" are not ambiguous. They point to cases which hold that "sudden" does have a temporal meaning. As such, a layperson would understand that contamination of the groundwater over an extended period of time was not sudden. Defendants further argue that spills of petroleum products were routine and therefore not accidental.

The court must decide two questions: first, whether the phrase "sudden and accidental" is ambiguous; and second, whether (at least for purposes of summary judgment) there is any evidence that the contamination of the groundwater was not sudden and accidental.

The Alaska courts have not yet ruled on this specific issue. After a review of cases from other jurisdictions that have interpreted the terms "sudden" and "accidental", it appears that for every case which found that "sudden" had a temporal meaning, another reached the opposite conclusion.[10] However, conflict in case law does not necessarily create an ambiguity. *Stordahl v. Government Emp. Ins. Co.,* 564 P.2d 63, 66–67 (Alaska 1977). "Under Alaska law, an ambiguity exists when the policy as a whole and the extrinsic evidence support differing reasonable interpretations." *Allstate Ins. Co. v. Ellison,* 757 F.2d 1042, 1044 (9th Cir.1985).

The policy itself and the extrinsic evidence do not create an ambiguity in this case. The court is not faced with policy terms that conflict with one another or terms that might mean one thing to an insurance purchaser and another to an underwriter. In this case, the court is instead called upon to interpret the terms "sudden and accidental" in their ordinary and popular sense. *Ellison,* 757 F.2d at 1044.

The court believes an inordinate amount of argument has been focused on the word "sudden". This argument, in large part, has been fruitless. In everyday English, "sudden" has a temporal meaning. However, "sudden" can also mean that an event happened without warning,[11] and when joined with the word "accidental",[12] it seems clear that the focus of the phrase is on the unexpected or unforeseen nature of the event.

When faced with making specific interpretations, other courts have construed the word "accident" to mean something unforeseen, unexpected, and unpremeditated; something which does not occur in the usual course of things. Appleman, *Insurance Law and Practice* § 360 at 449 (1979)

---

**9.** "Happening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for. *Hagaman v. Manley* 141 Kan. 647, 42 P.2d 946, 949." *Black's Law Dictionary* 1284 (5th ed. 1979).

**10.** *Compare Time Oil v. Cigna Property & Cas. Ins. Co.,* 743 F.Supp. 1400 (W.D.Wash.1990) (Under Washington law the word "sudden" does not include a temporal restriction of coverage.); *Upjohn v. New Hampshire Ins. Co.,* 178 Mich.App. 706, 444 N.W.2d 813 (1989) (The definition of "sudden" includes a temporal element as well as a sense of the unexpected.).

**11.** *Webster's Third New International Dictionary* 2284 (1981) defines "sudden" as "happening without previous notice or with very brief notice: coming or occurring unexpectedly: not foreseen or prepared for...."

**12.** *Webster's Third New International Dictionary* 11 (1981) defines accidental as "arising from or produced by extrinsic, secondary, or additional forces: not innate, intrinsic, or of the real nature of: nonessential ... *occurring sometimes with unfortunate results by chance alone"* (emphasis added).

The root word "accident" is defined as "an event or condition occurring by chance or arising from unknown or remote causes...." *Id.*

(footnote omitted). One court aptly explained the issue this way:

> What is an accident? Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon.... An accident, simply stated, is merely an unanticipated event; it is something which occurs not as the result of natural routine but as the culmination of forces working without design, coordination or plan.

*Brenneman v. St. Paul Fire & Marine Insurance Co.*, 411 Pa. 409, 192 A.2d 745, 747 (1963).

The court concludes that the phrase "sudden and accidental", as well as having a temporal meaning, can also refer to that which occurs without notice. Whether or not the contamination of the groundwater with benzene was sudden and accidental is really a question of fact. This issue is disputed among the parties. Summary judgment is, therefore, inappropriate.

The motions of Central, PEIC, and USF & G for summary judgment as to the pollution exclusion clause are denied.

### C.

#### *"Occurrence"*

USF & G argues that MAPI has the burden of establishing a valid claim. To establish a valid claim, MAPI must prove the damage occurred during the time the policy was in effect. The policy defines "occurrence" as:

> [A]n accident, including continuous and repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended* from the standpoint of the Insured.[13]

■ 1. *"Neither expected nor intended."* USF & G's first argument focuses on the words "neither expected nor intended". Relying on *Allstate Insurance Co. v. Roelfs*, 698 F.Supp. 815 (Alaska 1987), USF & G argues that MAPI's intent can be

inferred from the nature of its acts. USF & G argues that the product spills were routine and common by focusing on the fact that the spills occurred frequently. Thus, they were not unexpected or unintended.

■ This argument has a remarkable resemblance to the one proffered regarding "sudden and accidental". *See* 7A Appleman, *Insurance Law and Practice*, § 4499.5 at 35–36 (Supp.1991). Here, however, the focus is not just on the lay interpretation of policy language. The policy expressly requires that the damage be "neither expected nor intended *from the standpoint of the Insured*".[14] (Emphasis supplied.)

The difficulty with USF & G's argument is that casualty insurance is purposefully obtained to protect the insured against loss or damage caused by a contingent event. That does not mean that the resultant damage is expected or intended. *See generally* 7A Appleman, *Insurance Law and Practice* § 4492.02 at 26–38 (1979). While it may be true that product spills were a contemplated part of the daily process of refining petroleum products, the product spills were merely a factor in a chain of events that eventually led to contaminated groundwater. The defendants focus on the spills, rather than the cracked concrete sumps and leaky JP–4 tanks, as the cause of damage. There is no evidence that MAPI expected or intended for the various spill recovery systems to fail and cause the resultant damage to the groundwater. Absent such evidence, summary judgment on this issue is denied.

■ 2. *Trigger of Coverage.* USF & G argues that coverage is unavailable because there was no "occurrence" during the time the USF & G policies were in effect. Relying on cases from other jurisdictions, USF & G urges the court to adopt a "manifestation trigger of coverage" theo-

---

**13.** *See* USF & G insurance "jackets", Exhibit 6 to defendant USF & G's Motion for Summary Judgment (Clerk's Docket No. 280).

**14.** USF & G argues that an objective rather than subjective standard of intent should be applied.

In the present case, this analysis is unnecessary, since the policy clearly states that the damage must be neither expected nor intended "from the standpoint of the Insured." This requires application of a subjective standard.

ry. USF & G argues that the earliest manifestation of contaminated groundwater occurred on September 23, 1980, when a bulldozer ignited product floating on the groundwater. Assuming for the sake of argument that this was the first indication that petroleum products had entered the groundwater, USF & G points out that this is well past the expiration date of their last policy.

MAPI counters that coverage should be triggered when the groundwater was exposed to contaminants, not when the damage manifested itself. For this proposition, MAPI relies on *Clemco Industries v. Commercial Union Ins. Co.*, 665 F.Supp. 816, 820 (N.D.Cal.1987), *aff'd* 848 F.2d 1242 (9th Cir.1988).

In *Clemco*, a manufacturer of sandblasting protection equipment, faced with lawsuits by users who had contracted silicosis, sought a declaration of insurance coverage under its comprehensive general liability ("CGL") policies. *Clemco* explored the split of authority with regard to triggering insurance coverage. Relying on a prior Ninth Circuit ruling that applied California law,[15] the court found that an insurer was liable for coverage for any period when a claimant was exposed to an injury-causing agent. *Clemco*, 665 F.Supp. at 823.

The process of injury in this case is analogous to that in *Clemco*. Just as with silicosis, we can only guess as to when the groundwater became contaminated. Also, just as with silicosis, the damage did not manifest itself until many years later.

There is no Alaska case law on this point. This court is required to make its best appraisal of how the Alaska Supreme Court would rule. In light of the Alaska Supreme Court's general concurrence with California insurance law,[16] coverage should be triggered by exposure to contaminants rather than by manifestation of the damage.

■ Summary judgment is denied because exactly when the groundwater was exposed to contaminants is a triable question of fact.

■ 3. *Existence of USF & G Policy.* An additional argument raised by USF & G is that MAPI has failed to prove the existence of a third policy with clear and convincing evidence. The first two policies were issued by USF & G in April of 1977 and 1978. USF & G argues there is no evidence that it ever issued a third policy.

MAPI has presented sufficient evidence to establish the existence of a third policy that was issued on September 1, 1980. Although MAPI admits it was unable to locate the original policy after a good faith search, it can produce secondary evidence of the policy's existence. *See* Rule 1004, Federal Rules of Evidence.

MAPI has produced the certificate of insurance referencing the September 1980 policy and a cover letter from the insurance broker indicating that the policy was in effect. MAPI can produce invoices indicating payment of the premiums. The 1980 policy is referred to in other policies. Finally, there is no evidence of cancellation or withdrawal of the policy.

While USF & G argues that MAPI must prove the existence of the missing policy with clear and convincing evidence, it provides no Ninth Circuit authority for application of that evidentiary standard. MAPI has provided the court with sufficient evidence of the existence of the missing policy for the purposes of a summary judgment.

Summary judgment in favor of USF & G on this issue is denied.

### D.

#### *"Owned Property" Exclusion*

■ The CGL policies issued by the defendants contain standard "owned property" clauses. These clauses exclude coverage for damage to property which is owned by the insured. In its motion for summary judgment, MAPI has put the question before the court of whether the "owned prop-

---

**15.** *Hancock Laboratories, Inc. v. Admiral Ins. Co.*, 777 F.2d 520 (9th Cir.1985).

**16.** *See Jarvis v. Aetna Cas. & Sur. Co.*, 633 P.2d 1359 (Alaska 1981).

# 1462

erty" exclusion applies to contamination of the groundwater.

Other courts faced with this issue have turned to state statutes under which water is constituted a publicly owned resource. *Intel Corp. v. Hartford Acc. & Indem. Co.*, 692 F.Supp. 1171, 1183 (N.D.Cal.1988) (All water within the State is the property of the people of the State.); *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1193 (9th Cir.1986) (In Oregon all water belongs to the public.).

This court has previously ruled the "[t]he ownership of ground and surface waters is to be determined according to State [Alaska] law. Under the Alaska Constitution and state law the right to use such waterways is placed in the people of the State." *Alaska Public Easement Defense Fund v. Andrus*, 435 F.Supp. 664, 677 (D.Alaska 1977); *see also* Alaska Const. art. VIII, § 3; AS 46.15.030. While this authority does not specifically state that groundwater is owned by the people of Alaska, it clearly suggests that since use is enjoyed by all, ownership is not vested in any person. Accordingly, this court concludes, as it believes the Alaska Supreme Court would, that the groundwater is not the "owned property" of MAPI, and as such does not fall within the "owned property" exclusion.

MAPI's motion for summary judgment as to this issue is granted.

## E.

### *Known Risk*

■ Defendant Central requests summary judgment based on the theory that only contingent risks are covered, not those already known to the insured.[17] Central argues that the basic purpose of insurance is to indemnify against contingent risks. It is not the purpose of insurance to indemnify against damage that has already occurred. Central points to the definition of "insurance" in the Alaska statutes:

[A] contract whereby one undertakes to indemnify another or pay or provide a specified or determinable amount of benefit upon determinable *contingencies* . . . .

AS 21.90.900(18) (emphasis added).

The term "known risk" is responsible for much of the debate between the parties on a rather basic principle of insurance. Much of the debate disappears when the word loss is substituted for the word "risk". The heart of Central's argument is that insurance companies do not insure for losses that have already occurred. The court has no trouble accepting this common sense approach.

The question remains, however, of when MAPI knew it had a loss. This is a matter of factual dispute. Central argues that MAPI knew the groundwater had been contaminated by petroleum products as of March 1980. They point to evidence that in June of 1980, reports were sent to the ADEC regarding the contamination. MAPI firmly contests this charge. MAPI admits that it was well aware that spilled products were a problem in the early 1980's. At that time, however, MAPI believed the problem was localized and capable of remediation. Nor did MAPI turn a blind eye to the problem. MAPI presents evidence that in November of 1982 it installed a system designed to detect the presence of subsurface hydrocarbons. While the system did detect the presence of subsurface oil, it did not indicate the presence of dissolved benzene. MAPI argues that it did not become aware that "dissolved constituents" had entered the groundwater until January of 1987.

Because of the existing dispute over material facts, the court finds summary judgment inappropriate. Central's motion for summary judgment as to the issue of "known risk" is denied.

## F.

### *Notice*

■ On December 12, 1986, MAPI entered into an agreement with the ADEC

**17.** PEIC and USF & G have not joined in Central's motion regarding the issue of "known risk".

that required MAPI to remedy the problems at the refinery. It was not until 1989 that MAPI filed claims with the defendant insurance companies. Defendants argue that they were prejudiced by MAPI's late notice of the loss, and as such should be excused from any obligation to indemnify.[18]

■ Under Alaska law, an insurer has the burden of proving "that it has actually been prejudiced by the delay before its liability is extinguished" *Weaver Bros., Inc. v. Chappel,* 684 P.2d 123, 126 (Alaska 1984). "Generally proof of prejudice to the insurer is a question of fact." *Id.* (citation omitted).

Defendants assert five ways in which their ability to handle the claim has actually been prejudiced by late notice: (1) limited opportunity to investigate claims; (2) contact potential witnesses; (3) enter into negotiations and have input into the ADEC's decisions regarding its consent order; (4) bring subrogation claims for defective construction of the NPR; and (5) examine documents which have been destroyed in the intervening years. Each one of these allegations is disputed by MAPI. Given that proof of prejudice to the insurer is a question of fact and that the facts here are disputed, this issue is unsuitable for summary judgment.

Central's motion for summary judgment on the issue of notice, in which PEIC and USF & G have joined, is denied.

### G.

#### Cleanup Costs as Damages

■ All of the policies contain language indemnifying the insured for amounts it may become liable to pay as damages.[19] The issue the court must decide is whether, under Alaska law, environmental cleanup costs required by a consent order are damages within the meaning of an insurance policy. A second issue is whether contamination of the groundwater qualifies as "property damage".

1. *Cleanup Costs as Damages.* MAPI argues that while there is no Alaska law directly on point, the weight of authority supports a finding by the court that cleanup costs are damages and that the contamination of groundwater is property damage. It argues that a reasonable layperson would understand the term "damages" to include cleanup costs as required by the consent order. It is MAPI's position that a layperson would have no inkling of the distinction between damages at law and equitable remedies. Further, MAPI argues that limitations on recovery must be interpreted narrowly; and if an insurer wants to limit its liability to exclude equitable relief, it should say so clearly.

MAPI's final argument rests on public policy. MAPI argues that if the cleanup costs mandated under the consent order are not considered "damages", then there is no incentive for companies like MAPI to voluntarily enter into such orders. MAPI argues that under this interpretation, an insured is better off waiting until the ADEC has entered judgment against them. This, MAPI argues, is counter-productive. Voluntary consent orders avoid litigation and help effectuate the ultimate goal of remediating valuable resources.

The centerpiece of defendants' answer to these arguments is *O'Neill Investigations v. Ill. Emp. Ins. of Wausau,* 636 P.2d 1170 (Alaska 1981). In *O'Neill Investigations,* the Alaska Supreme Court was faced with a similar legal issue. O'Neill Investigations, Inc., was a debt collection agency charged with numerous violations of the Consumer Protection Act. The attorney general sought injunctive relief, civil penalties, and an order for restoration of monies to debtors. *Id.* at 1172. O'Neill Investigations referred the complaint to its insurance company. The insurance company denied an obligation to defend with regard to injunctive relief, but did agree to pay one-

---

**18.** PEIC and USF & G have joined in Central's motion for summary judgment as to the issue of late notice.

**19.** For a comparison of the specific policy language, see plaintiff's Memorandum in Support of Partial Summary Judgment Re: Cleanup Costs as "Damages" because of "Property Damage" at 5–6 (Clerk's Docket No. 273).

half of any attorney's fees, costs, and civil damages that might arise from the matter. *Id.*

*O'Neill Investigations* relied on two cases from other jurisdictions.[20] *O'Neill Investigations* interpreted those cases to narrowly define the term "damages" and focused on the textbook difference between compensatory damages, restitution, and equitable relief. *Id.* at 1174–75. The court found that O'Neill Investigations' claims did not "constitute a claim for damages." *Id.* at 1175. However, the court expressly found that *not* "all claims seeking restitution are outside of the standard liability policy provisions providing coverage for suits 'seeking damages'." *Id.* at 1176. The court applied the general rules of insurance contract construction to the policy at issue and found that, after viewing the policy in its entirety, a reasonable layperson would understand that O'Neill Investigations' claims were not covered. *Id.* *O'Neill Investigations* does not stand for wholesale exclusion of "equitable" remedies from an interpretation of the term "damages".

Defendants also argue that MAPI's public policy argument is specious. They contend that when MAPI built the refinery it knew it must comply with Alaska environmental standards. MAPI did not, according to defendants, and MAPI now wants the insurance companies to pay the cost of fixing a refinery which was not constructed properly in the first place. They argue that allowing cleanup costs to be considered damages would create a disincentive for MAPI to obey the law. By waiting for an enforcement order, MAPI could shift the cost of compliance to its insurers.[21]

In resolving this issue, two cases from California and Washington are useful. Both discuss policy language almost identical to that presently before the court.

In *AIU Ins. Co. v. FMC Corp.*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990), the California Supreme Court thoroughly reviewed the split in authority and the reasoning upon which various jurisdictions had rested their decisions. *Id.* 274 Cal.Rptr. at 829–31, 799 P.2d at 1262–64. The court then applied California's rules of insurance policy interpretation, which are almost identical to Alaska's, and held:

> [E]nvironmental injunctions requiring remedial and mitigating action result in costs that constitute "damages" under CGL policies. Because an insured would reasonably expect equal coverage of the costs of equivalent or alternative remedies, the cost of injunctive relief under the statutes in question here [CERCLA and related state statutes] are "damages" for CGL purposes.

*Id.* 274 Cal.Rptr. at 845, 799 P.2d at 1278 (footnote omitted).

In *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wash.2d 869, 784 P.2d 507 (1990), the Washington Supreme Court faced similar legal issues. There, too, an insured faced cleanup costs for contaminated groundwater. After an extensive discussion of the authorities, *Boeing*, applying Washington insurance law almost identical to Alaska law, held:

> [W]e agree with the majority of cases across the country that the plain meaning of damages does not distinguish between sums awarded on a "legal" or "equitable" basis and that the plain meaning of damages may include cleanup costs to the extent these costs are incurred because of property damage.

*Id.* 784 P.2d at 515.

▪ A district court sitting in diversity must apply the law as it believes the supreme court of the state in which it sits would apply it. *Insurance Co. of North*

---

**20.** *Seaboard Surety Co. v. Ralph Williams Northwest Chrysler Plymouth, Inc.*, 81 Wash.2d 740, 504 P.2d 1139 (1973); *Haines v. St. Paul Fire & Marine Insurance Co.*, 428 F.Supp. 435 (D.C.Md. 1977).

**21.** Another argument defendants make is that cleanup costs are not equivalent to damages. They argue that "restoration costs serve as a

damage measure only to the extent such costs do not exceed the diminished value of the property". *Conkin v. Ruth*, 581 P.2d 923, 925 (Okla.App.1976). This argument requires exalting the technical, legal definitions of terms over the understanding a reasonable layperson would normally employ. It is unpersuasive.

*America v. Howard,* 679 F.2d 147, 149 (9th Cir.1982). The above-mentioned cases are a persuasive foundation for divining what the Alaska Supreme Court would hold. They involve nearly indistinguishable facts and apply almost identical state insurance law. The above-discussed cases are well-reasoned and based on thorough review of the authorities. The decisions are not reflections of those states' particular environmental policies.

In so finding, the court is not ignoring the Alaska Supreme Court's holding in *O'Neill Investigations.* This court believes that *O'Neill Investigations* is limited to its facts, and that the Alaska Supreme Court would find that cleanup costs at NPR are "damages". In the present case, MAPI is being required to pay for damages it accidentally caused. This is distinguishable from O'Neill Investigations' alleged intentional acts.[22]

For these reasons, this court finds that the term "damages" is subject to an interpretation that includes cleanup costs. Summary judgment is granted in favor of MAPI on this issue.

■■■ 2. *Contamination of Groundwater as Property Damage.* The last issue is whether groundwater contamination qualifies as "property damage".[23] MAPI relies on *Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188 (9th Cir.1986). Applying Oregon law, the Ninth Circuit held that the discharge of fuel oil into the Willamette River was property damage. *Id.* at 1194. By statute, all water in the state of Oregon belongs to the public. *Id.* at 1193. Discharge of oil into the water was prohibited by Oregon statute, and the statute provided a cause of action for damage to water. *Id.* The Ninth Circuit agreed with the district court that the Oregon Supreme Court would adopt the "reasonable enlightened view" and found that "discharge of pollution into water causes

damage to tangible property and hence cleanup costs are recoverable under a property damage liability clause." *Id.* at 1194.

The underpinning of the ruling in *Portland* is also applicable to Alaska. The Alaska Constitution indicates that water is a resource for the common use of all Alaskans. Alaska Const. art. VIII, § 3. Discharge of petroleum products into the water is prohibited. AS 46.03.740. Civil penalties are available for discharge of petroleum products. AS 46.03.758. Once again stepping into the shoes of the Alaska Supreme Court, this court concludes that contamination of groundwater qualifies as property damage and as such is covered under MAPI's insurance policies.

Summary judgment in favor of MAPI is granted as to this issue.

## CONCLUSION

For the reasons explained above, the court hereby makes the following rulings:

1. Defendant PEIC's motion for summary judgment on the definition of "watercourse or body of water" is granted. MAPI's cross-motion on the same issue is denied. However, the phrase "watercourse and body of water" must be read in conjunction with the terms "sudden and accidental" found in the pollution exclusion clause.

2. Defendant Central's motion for summary judgment regarding the interpretation of the pollution exclusion clause, in which PEIC joined, is denied.

3. Defendant USF & G's motion for summary judgment is denied.

4. Plaintiff MAPI's motion for summary judgment regarding the "owned property" exclusion is granted in part. However, summary judgment is denied as to the pollution exclusion clause and "occurrence" issue, as triable issues of fact exist.

---

**22.** O'Neill Investigations was accused of making various misrepresentations to alleged debtors, threatening alleged debtors with exposing their debts to employers and business associates, telephoning employers of alleged debtors before entry of judgment, and impersonating law enforcement officers. *O'Neill Investigations,* 636 P.2d at 1173.

**23.** This issue is very similar to the above-mentioned issue of groundwater as "owned property".

5. Defendant Central's motion for summary judgment regarding known risk and notice, in which PEIC and USF & G joined as to the issue of notice, is denied.

6. Plaintiff MAPI's motion for partial summary judgment regarding cleanup costs as damages is granted.